NORTHWEST ENVIRONMENTAL ADVOCATES, A Non–Profit Oregon Corporation and Nina Bell, Plaintiffs–Appellants,

v.

CITY OF PORTLAND, Defendant– Appellee.

No. 92–35044.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1993.

Decided Dec. 10, 1993.

---

Patrick A. Parenteau, Perkins Coie, Portland, OR, for plaintiffs-appellants.

Terrence L. Thatcher, Office of City Attorney, Portland, OR, for defendant-appellee.

Before: PREGERSON, KLEINFELD, Circuit Judges, and INGRAM, District Judge.[*]

INGRAM, District Judge:

Northwest Environmental Advocates and Nina Bell (NWEA) appeal from the district court's judgment in favor of Portland on their claims that the City is violating the Clean Water Act (CWA).

On April 16, 1991, NWEA filed suit in the district court alleging that Portland's practice of discharging raw sewage during times of precipitation from 54 outfall points was not covered by a permit and that the practice had caused and was continuing to cause violations of Oregon's water quality standards. After a trial on the written record, the district court held that 1) the contested discharge points were covered by Portland's pollution permit, and 2) the court lacked jurisdiction to consider NWEA's water quality violation claims. We AFFIRM both holdings.

## I. BACKGROUND

### A. THE PORTLAND SEWAGE TREATMENT SYSTEM

At issue is the operation of the Portland sewer system. Portland operates a sewage treatment system that includes a network of combined sewage and stormwater pipes. Although the construction of these combined sewer pipes was discontinued in 1962, approximately 70% of the City's sewers remain combined sewers. Supp.E.R. 21. The effluent flowing in the system ideally is intercepted and transported to the Columbia Boulevard Treatment Plant where it is treated and then discharged into the Columbia River through two outfalls (Nos. 001 and 002). The interceptors can carry only " 'three times [the] average dry weather flow' " of effluent to the treatment plant. Sunnarborg Aff., Supp.E.R. 21. When the flow exceeds the plant's capacity, as can occur during periods of precipitation, the effluent is released untreated through a system of combined sewer

overflow (CSO) outfalls in what is termed a CSO event. There are between 50 and 80 CSO events every year in Portland. E.R. 216; see also Bureau of Environmental Services, City of Portland, Columbia Slough Planning Study Background Report (1989) (there are between 67 and 79 CSO events per year in the Columbia Slough).

Portland has 54 CSO outfalls; 12 drain into the Columbia Slough and 42 drain into the Willamette River. These waterways and their environs are used by Portland residents for recreation, including water contact activities such as boating. The release of untreated sewage into such public waters can present health risks. See National Combined Sewer Overflow Control Strategy, 54 Fed. Reg. 37370, 37371 (1989) ("CSOs have been shown to have severe adverse impacts on human health under certain conditions."). Appellants have supplied both anecdotal and scientific evidence of the polluted nature of the Willamette River and the Columbia Slough, especially during and immediately after CSO events. See, e.g., Portland's Response to NWEA's Interrogatories, E.R. 119; Thutt Aff., E.R. 159–178; Pratt Aff., E.R. 20.

Abatement of CSO events is not easy. It has been estimated that to solve the problem in Portland alone will cost between $500 million and $1.2 billion dollars. E.R. 221. Estimates for the entire nation are between $70 billion and $109 billion dollars. Environmental Groups Call for Effort to Deal with Combined Sewer Problems, 23 Env.Rptr. (BNA) 13 (1992) (upgrades could start at between $70 and $80 billion dollars); Combined Sewer Overflow Problems Demand New Approach, Local Officials Say, 20 Env. Rptr. (BNA) 1939 (1990) (costs could be as high as $109 billion).

### B. PROCEEDINGS IN THE DISTRICT COURT

On February 1, 1991 NWEA gave written notice to Portland, the EPA Administrator, the State of Oregon, and the EPA Regional Administrator of its intent to file suit in the district court challenging the legality of the

[*] The Honorable William Ingram, United States Senior District Judge for the Northern District of California, sitting by designation.

CSO discharges. Complaint, E.R. 9. In April 1991, after the required 60 day notice period, NWEA filed this action.

The crux of the NWEA complaint was that the 54 CSO outfalls being used regularly by the City were not covered by the City's 1984 National Pollution Discharge Elimination System (NPDES) permit. Because unpermitted discharges of pollutants are illegal, NWEA argued the City was violating the CWA. Even if the CSOs were covered by the permit, NWEA argued that the discharges violated Oregon water quality standards and therefore violated a condition of the Permit. These violations were ongoing and likely to continue. NWEA prayed for injunctive relief and civil penalties. Complaint, E.R. 10–11.

The 1984 permit was to expire in July 1989. However it remained in effect until Portland and the Oregon Department of Environmental Quality (DEQ)[1] were able to complete the renewal process and agree on the terms of a new permit. DEQ forwarded a draft of a proposed renewal permit to Portland in December 1990. This draft permit required the City to "meet water quality standards at all discharge points, including CSOs, ..." Appellee's Brief at 11. Because Portland could not meet the five year time table set forth in the proposed renewal permit, *id.*, the parties determined that a compliance order separate from the renewal permit, and requiring eventual abatement of all CSO events, was appropriate. After a period of Notice and Comment, Portland and the DEQ came to an agreement in August 1991. Under that settlement, Portland's new permit specifically listed the CSOs as permitted discharge points. In addition to the permit, the parties entered into a stipulation and final order (SFO) in which Portland agreed to replace the CSO system within the next 20 years.

Once these negotiations had been completed, Portland filed a motion to dismiss and the parties filed cross-motions for summary judgment. The court bifurcated the proceedings; first it would address whether Portland could be held liable for violations of the CWA, and then if necessary, determine whether violations had occurred and impose any necessary penalties. The parties stipulated to a trial of the liability phase on the summary judgment submissions, allowing the court to decide questions of fact as well as questions of law. Amended Opinion, E.R. 73.

After reviewing the submissions the district court issued an opinion and judgment. It later filed an amended opinion which was essentially the same as the original. The court found that Portland's 54 CSOs were covered by the 1984 NPDES permit, and thus that the City was not in violation of the Act for allowing unpermitted discharges. It also rejected NWEA's claim that Portland would nonetheless be liable for violating Oregon's water quality standards because CWA did not confer federal jurisdiction to entertain citizen suits to enforce state water quality standards.

## II. ANALYSIS

### A. DOES THE 1984 PERMIT COVER THE CSOs?

In the court below, NWEA argued that Portland had violated and continued to violate the CWA by discharging through unpermitted outfalls. The district court found otherwise, holding that the relevant NPDES discharge permit authorized CSO events under specific circumstances. NWEA asserts that the district court erred in so interpreting the permit.

We review the district court's interpretation of the 1984 permit as we would the interpretation of a contract or other legal document. When reviewing a district court's interpretation of such a writing, the court reviews *de novo* the determination of whether it is ambiguous. *In re U.S. Fin. Sec. Litig.*, 729 F.2d 628, 632 (9th Cir.1984). Interpretation of an unambiguous writing is also a question of law subject to *de novo* review. *Culinary & Service Employees Union, Local 555 v. Hawaii Employee Ben. Admin., Inc.*, 688 F.2d 1228, 1230 (9th Cir. 1982). If the court must look to extrinsic evidence in order to interpret a writing, its findings of fact are reviewed for clear error.

---

1. National Pollution Elimination Discharge Permits in Oregon are issued by DEQ.

*U.S. Fin. Sec.,* 729 F.2d at 632; *Culinary & Service Employees Union,* 688 F.2d at 1230; *In re Agricultural Research & Technology Group, Inc.,* 916 F.2d 528, 537 (9th Cir.1990).

NWEA argued in the court below that the 1984 permit covered only two point sources, outfalls 001 and 002 from the treatment plant.[2] The 1984 permit expressly "covers" only two point sources, outfalls 001 and 002 from the treatment plant. These outfalls are listed on the first page of the permit as the "SOURCES COVERED BY THIS PERMIT." E.R. 222. The 54 CSOs are not listed in this section. The first page of the permit also states that the receiving waterway for these discharges is the Columbia River. The Willamette River and the Columbia Slough are not mentioned.

Immediately below the section listing "SOURCES COVERED," the permit provides a description of the activities that are covered by the permit. This section, "PERMITTED ACTIVITIES," states that Portland is authorized to "operate a waste water collection, treatment, control and disposal system and discharge to public waters adequately treated waste waters only from the authorized discharge point *or points established in Schedule A . . . .*" E.R. 222 (emphasis added). Schedule A provides the effluent limitations for outfalls 001 and 002. More importantly, however, it provides that:

> The permittee shall provide interception of at least three times the dry weather flow before discharge shall occur at any diversion structure. The overflow from these diversion structures shall be minimized and/or eliminated as much as practicable during the water recreation season (June 1 to October 31).[3]

E.R. 223. Thus, on the face of the permit it appears that CSO events were considered to be a "permitted activity." Finally, Schedule C provides that the City must "continue to work toward the separation of sanitary sewage and storm water in presently developed areas in which this method is cost effective." E.R. 224.

NWEA contends that the court should only heed the first portion of the permit listing covered sources.[4] Because the CSOs are not specifically listed on page one as permitted sources, NWEA argues, they must not have been encompassed by the permit and are therefore illegal. To follow this reasoning would require the court to read the references to diversion structures out of the permit altogether. The limitations on the frequency of CSO events and the requirement that Portland work towards upgrading its sewer system would then constitute mere surplusage.

The 1984 permit is clear on its face in permitting CSO events under specified conditions. The description of permitted activities specifically allows Portland to operate a sewage system and to discharge through two separate sets of discharge points, those listed on page one as authorized discharge points, and those described and listed in Schedule A.

The extrinsic evidence presented to the district court only strengthens this conclusion. The parties each offered evidence, in the form of affidavits and other documentary evidence, to support their respective understandings of the 1984 permit. NWEA relied mainly on four documents to support the position that the CSOs were not, and had never been, permitted. The first was a letter from W.C. Gaffi, Portland's Chief Engineer, to DEQ in 1988. Gaffi stated that "[t]he City supports ODEQ's position to permit the CSO outfalls through a modification to the existing treatment permit. This approach should

---

2. Effluent from outfalls 001 and 002 has been treated before it is discharged into the Columbia River.

3. The parties do not dispute that "diversion structure" refers to the CSOs.

   In earlier permits, the 54 CSOs were listed in this provision of the permit. *See* Supp.E.R. 13 (1979 permit, "Discharge at overflow points 003 through 066 is permitted when the flow at diversion structures exceeds three times the dry weather flow."); Supp.E.R. 2 (1974 permit—same).

4. NEA attempts to downplay the importance and placement of the references to diversion structures, implying that they are somehow a part of the fine print. In reality however, the limitations on the frequency of CSO events appears in normal sized type on page two of the permit, directly below the effluent limits for discharges from outfalls 001 and 002. *See,* E.R. 223.

achieve the same goal as individual CSO permits and reduce the administrative cost of doing so." E.R. 278. The second document was an October 1990 memorandum from two members of the Portland Bureau of Environmental Services. In this memo, Linda Mac-Pherson and Dave Kliewer indicated the need to set up a "discussion to determine if the CSOs are going to be permitted or not?" E.R. 279. The third is an undated memorandum in which a DEQ employee wrote that "[t]he potential exists for permitting both the storm and combined sewer discharges." E.R. 191. NWEA argues that these three documents imply that the CSOs were not covered under the 1984 permit, because if they were, there would be no need to address including them in future permits.

Finally, NWEA offered a DEQ policy statement entitled "Strategy for Regulating Combined Sewer Overflows."[5] The report states that "[n]one of these outfalls [the CSOs] are covered by a permit, however, all are proposed to be addressed in the Portland–Columbia Blvd STP permit renewal." E.R. 208. NWEA argues that this statement proves that DEQ had not permitted the CSOs in the 1984 permit. Portland, however, offered an affidavit by the author of the report to explain the statement. Barbara Burton explained that the quoted text did not mean that Portland's CSOs were not covered by an NPDES permit, and therefore were illegal. Instead, it was intended to convey that "none of the outfalls were individually *listed* with effluent limitations in Portland's 1984 NPDES permit." E.R. 281 (emphasis in original).

Barbara Burton's impression of the scope of the Portland NPDES permit was shared by Harold L. Sawyer, formerly the Water Quality Division Administrator for DEQ. E.R. 282. Sawyer stated in his affidavit that "Portland's entire sewer system, including CSO outfalls, was permitted by Portland's 1984 NPDES permit and by its prior NPDES permits." E.R. 283. According to Sawyer, DEQ knew, and always had known, that the Portland sewer system operated through a system of CSOs and treatment

plants. *Id.* Moreover, "[i]f DEQ had considered combined sewer overflows to be outside of Portland's NPDES permit, as Water Quality Division Administrator for DEQ [he] would have proposed a specific program and schedule for treatment or elimination of such discharges for incorporation in the permit or in a separate compliance order." *Id.* These are the steps that DEQ took in 1991. Thus, "DEQ understood that Portland would continue to operate its combined sewer system as it had been operating the system prior to the existence of the NPDES permitting program, to prevent dry weather combined sewer overflows except during abnormal storm events." *Id.* at 285.

This position is repeated in the 1991 SFO. DEQ stated that "as a matter of policy the Department [DEQ] did not always list CSO discharge points in an NPDES permit but, in many instances, issued permits for an entire sewer system ... [Portland's] 1984 NPDES permit is a permit for the sewer system, which includes CSO outfalls, but did not contain specific effluent limitations for CSOs." E.R. 260–61.

The district court, having reviewed these conflicting statements, found Portland's interpretation to be persuasive. The court recognized the import of the Gaffi letter, but determined that it was "not persuasive enough in the face of the common sense reading of the permit, which when examined in context with the older permits and when construed to give the language limiting discharges meaning, directs a conclusion that the 1984 permit covered the CSO discharges." E.R. 83. The Sawyer and Burton affidavits were more persuasive because their explanations of the 1984 permit comported with the language of the permit itself. *Id.*

NWEA argues that, notwithstanding the extrinsic evidence, under the rules of contract interpretation the court must find that the CSOs were not covered by the 1984 permit. Courts should, if possible, interpret a contract so that its terms will not be illegal. *See* Corbin, *Contracts* § 546 at 169 (1960). This rule is advisory and should not be applied blindly to the detriment of the parties'

---

**5.** This February 1991 document appears to have been prepared in response to the EPA's National Combined Sewer Overflow Control Strategy. *See* 54 Fed.Reg. 37370 (Sept. 8, 1989).

intentions. "[A] specific provision in an otherwise valid contract should not be given a meaning that would have a legal effect that the court is convinced the parties did not intend, even though any alternative meaning will cause the provision to have no legal effect whatever." *Id.*

Under the regulations promulgated pursuant to § 1342 of the Clean Water Act, all NPDES permits should establish technology-based effluent limitations for all permitted point sources. 40 C.F.R. 122.44(a). Although technically the permit should have established effluent limitations for the CSOs, it appears that the parties intended to omit such requirements. The district court was presented with sufficient evidence from which it could determine that DEQ, as well as Portland, intended this allegedly unlawful interpretation. EPA approved the terms of the permit, including the absence of effluent limitations for the CSOs, even though the existence of the CSOs was clear on the permit's face. Moreover, prior to 1989, it appears that many state permitting bodies believed that CSO outfalls could be permitted without being subjected to effluent limitations. *See* National Combined Sewer Overflow Control Strategy, 54 Fed.Reg. 37370, 37371 (1989) (proposed regulations to "control effluents from combined systems which are not regulated under the sanitary system standards nor as discharges from separate storm sewer regulations"). *Cf., Montgomery Environmental Coalition v. Costle,* 646 F.2d 568, 592 (D.C.Cir.1980) (interpreting permit as allowing limited CSO events without effluent limitations).

■ NWEA next argues that the district court erred by failing to interpret the permit in the public interest. This is "a rule of construction rather than one of interpretation, one that for reasons of public policy requires the court to give to a contract that legal operation that is of public advantage, when a choice between that and a less advantageous operation is reasonably open." Corbin, *supra* § 550 at 196. In NWEA's view, the 1984 permit should be interpreted as not allowing the CSOs because "[c]learly it is not in the public interest to construe a permit so as to authorize the gross pollution of public

waterways." Reply at 7. The alternative to the CSOs is a total revamping of the Portland sewer system, the cost of which has been estimated at as much as 1.2 billion dollars. E.R. 221. Moreover, until such renovations could be completed, if the excess effluent during storms was not released through the CSOs the effluent would "flood[ ] streets and basements." Sunnarborg Aff., Supp.E.R. 21. Although water pollution is unfortunate, it beggars credulity to argue that this alternative is so clearly more in the public interest than the CSO events.

The district court's findings are not clearly erroneous. There was significant evidence from DEQ, the permit author, to indicate that the CSOs were covered in the 1984 permit. Moreover, DEQ's interpretation, that the CSOs were permitted but not separately listed, does not directly conflict with NWEA's offered extrinsic evidence. Given Sawyer's and Burton's explanations, Gaffi and MacPherson's concerns about permitting the CSOs can be explained as concern over whether the CSOs should be expressly listed on new permits. We, accordingly, affirm the district court's finding that the permit authorized limited discharges from the CSOs.

## B. DOES NWEA HAVE A CAUSE OF ACTION FOR WATER QUALITY VIOLATIONS?

NWEA argues that the district court erred in finding that it did not have jurisdiction over a citizen suit for the enforcement of the water quality maintenance provision of the NPDES permit.

In the court below NWEA argued that, whether or not the CSOs were specifically permitted under the 1984 NPDES permit, Portland had violated and continued to violate conditions of both the 1984 and 1991 NPDES permits. Specifically, NWEA alleged that Portland's CSO events violated a permit condition prohibiting any discharges that would violate Oregon water quality standards. The 1984 permit held, as a condition in Schedule A, that "[n]otwithstanding the effluent limitations established by this permit, no wastes shall be discharged and no activities shall be conducted which will violate Water Quality Standards as adopted in

OAR 340–41–445 except in the following defined mixing zone ..." 1984 Permit, E.R. 223. The mixing zone was defined as a 100 foot radius around the discharge point. *Id.* The 1991 permit contained similar limitations but eliminated the mixing zone provision. It also expressly applied the condition to the CSOs. *See* E.R. 235 *and compare with* E.R. 223. NWEA offered declarations and scientific reports that it argued establish continuing violations of the water quality standards in the waters surrounding the CSOs after CSO events. *See, e.g.* Portland's Response to Interrogatories, E.R. 119 (failure to meet fecal coliform standards); Thutt Aff., E.R. 164 ("not possible to have any CSO event that would not exceed the DEQ's fecal coliform standard"); Rosolie Aff., E.R. 153–54.

The district court never reached the question of Portland's liability for violations of this permit condition. Instead, the court held that the Act did not grant federal jurisdiction for the citizen enforcement of water quality violations, "because water quality standards do not equal 'effluent standards or limitations under this chapter.'" E.R. 84. A general water quality maintenance condition like the one found in the 1984 and 1991 permits is not the type of "condition" that the court found would trigger federal jurisdiction. Instead, "[g]iven the distinction between effluent limitations and water quality standards, ... and the problems with analyzing violations of water quality standards as opposed to effluent limitations, ... state water quality standards can constitute effluent standards, violations of which may be actionable in a citizen suit, only if they are incorporated into an NPDES permit through effluent limitations." E.R. 86. Because the water quality standards in this case had not been translated into end-of-the-pipe discharge limitations, NWEA was not authorized to bring suit. Finally, the district court stated that to allow enforcement of the standards would be "nonsensical" because it would permit discharges from CSOs in

Schedule A while simultaneously prohibiting them. *Id.*

NWEA argues that the district court erred in finding that the provisions of the CWA do not authorize federal jurisdiction for citizen suits to enforce water quality conditions of NPDES permits. Whether expressly stated permit conditions prohibiting discharges that cause water quality violations are enforceable by citizens is a question of first impression in the courts of appeals. We review the district court's interpretation of the statute *de novo*.

The City of Portland correctly points out that the authorities generally reject citizen suit standing to enforce water quality standards. *See Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 850 (9th Cir.1987); *New York v. United States,* 620 F.Supp. 374 (E.D.N.Y. 1985); *McClellan Ecological Seepage Situation (MESS) v. Weinberger,* 707 F.Supp. 1182, 1200 (E.D.Cal.1988). *But see McClellan Ecological Seepage Situation (MESS) v. Cheney,* 763 F.Supp. 431, 443 (E.D.Cal.1989); *MESS,* 707 F.Supp. at 1203. We have said "it is not the water quality standards themselves that are enforceable in section 1311(b)(1)(C), but it is the 'limitations necessary to meet' those standards, or 'required to implement' the standards." *Oregon Natural Resources Council,* 834 F.2d at 850; *see also MESS,* 707 F.Supp. at 1200 ("[I]f a state water quality standard has not been incorporated into an NPDES permit *through an effluent limitation,* it is outside the scope of section 301(b)(1)(C).") (emphasis added). All of these statements are either in cases distinguishable from the one before us or are dicta. Nevertheless, they do show that whenever courts have been faced with the question, the answer has been that citizen suits cannot be used to enforce water quality standards. The plaintiffs have not cited any authority to us on the other side.[6] They have not been able to find a single case in which a court held that citizen suits could be used to enforce water quality standards, whether the

---

**6.** In *Montgomery Environmental Coalition v. Fri,* 366 F.Supp. 261, 265 (D.D.C.1973), the court held that water quality standards were enforceable in citizen suits, at least until effluent standards under the Act had been promulgated.

However, the court later reversed itself. *See Montgomery Environmental Coalition v. Washington Suburban Sanitary Commission,* 607 F.2d 378, 381 (D.C.Cir.1979).

water quality standards were incorporated in a NPDES permit or not.

The starting point for determining whether the CWA provides federal jurisdiction for citizen suits attempting to enforce water quality standards must be the statute itself, both the provisions governing citizen suits and those governing the establishment of water quality standards.

Every state is required to promulgate water quality standards. 33 U.S.C. § 1313(a). These standards are then reviewed and either accepted or rejected by the EPA Administrator. *Id.* If it is determined that water quality cannot be maintained or achieved under the normal effluent limitations, the Act authorizes the imposition of stricter effluent limitations in order to attain and maintain water quality.[7] 33 U.S.C. § 1312; 33 U.S.C. §§ 1311(b)(1)(C) (requiring by 1977 any more stringent standard for effluent limitations necessary to meet water quality standards); 40 C.F.R. § 122.-44(d)(1)(iii) (requiring stricter effluent limits when necessary to avoid "an in-stream excursion above the allowable ambient concentration of a State numeric criteria within a State water quality standard for an individual pollutant."); *see also* Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 1972 U.S.C.C.A.N. 3668, 3712–13 (*hereinafter* 1972 U.S.C.C.A.N.); 54 Fed. Reg. 37370, 37373 (Sept. 8, 1990) ("Permits must be written to ensure CSO discharges do not cause violations of water quality standards.").

Federal jurisdiction over citizen suits to enforce the Clean Water Act is authorized in 33 U.S.C. § 1365 (CWA § 505). Section 1365 authorizes private citizens to bring suit in the district court "(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter ..." 33 U.S.C. § 1365(a)(1). Section 1365(f) states:

> For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of

section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard or performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (7) a regulation under section 1345(d) of this title.

Reading the statute in context, reveals the following structure:

> § 1365(a) allows citizen suits to enforce effluent limitations;

> § 1365(f) defines effluent limitations as end-of-pipe limitations and permit violations;

> § 1311 et seq. establish a NPDES permit system to require end-of-pipe effluent limitations tailored to achieve water quality standards.

33 U.S.C. § 1342 sets out the requirements for issuance of NPDES permits. Section 1342 allows NPDES permits to be issued which "apply, and insure compliance with, any applicable requirements of 33 U.S.C. §§ 1311, 1312, 1316, 1317, and 1343," as well as 33 U.S.C. § 1318. 33 U.S.C. §§ 1342(b)(1)(C) and 1342(b)(2)(A). These sections require, inter alia, that pollutant discharges meet effluent limitations calculated to achieve water quality standards. *See* 33 U.S.C. §§ 1311(b)(1)(C) and 1312(a). None of these sections, however, require that a *permittee* directly comply with water quality standards. Rather, it is the duty of the *permit-issuing authority* to include in the permit end-of-pipe effluent limitations that will ensure that water quality standards are met. *See Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 850 (9th Cir.1987).

---

**7.** In this case, DEQ did not translate the relevant water quality criteria into effluent discharge limitations.

■ The permit at issue in the instant case fails to set out such limitations as to the CSOs. Since plaintiffs in the instant case have not alleged violations of end-of-pipe effluent limitations or of any other permit conditions contemplated by 33 U.S.C. § 1342, they lack standing to sue under 33 U.S.C. § 1365.

The cases that have found standing to enforce reporting requirements of NPDES permits are distinguishable from the instant case because permits are required to include reporting requirements pursuant to 33 U.S.C. §§ 1342 and 1318. *See, e.g., Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109, 1115 n. 9 (4th Cir.1988) ("the reporting requirements of the Act and Simkins' NPDES permit are essential elements of the Clean Water Act's enforcement procedures"); *see also Menzel v. County Utilities Corp.,* 712 F.2d 91 (4th Cir.1983).

A careful reading of the legislative history provides evidence supporting both NWEA's and the district court's interpretation of § 1365. As NWEA points out, in explaining the meaning of § 1365(f), the Senate Committee on Public Works implied that there were *no* limits on the types of permit conditions that would be enforceable. "In addition to violations of section 301(A) citizens are granted authority to bring enforcement actions for violations of ... any condition of any permit issued under section 402." 1972 U.S.C.C.A.N. at 3747. This broad statement does not exist in a vacuum however. For instance, earlier in the same document, a more limited statement of the scope of citizen enforcement was made. There the Committee stated that citizens could bring enforcement actions "against those who violate effluent standards or compliance orders." *Id.* 3677. No mention is made of general water quality conditions.

Moreover, when the broad statement of jurisdiction is read in conjunction with the balance of the legislative history, the backdrop of the 1972 Amendments and the practical considerations surrounding cases of this sort, it becomes clear that Congress did not intend such a limitless grant of jurisdiction when it enacted § 1365(f)(6).

The 1972 Amendments to the Clean Water Act reflect a 180 degree shift in the governments' attempts to control water pollution. Prior to 1972, the Federal Water Pollution Control Act approached the job of protecting and preserving the nation's waters through a program of establishing and enforcing water quality standards. Under the pre–1972 legislation, the federal government was authorized to bring enforcement actions whenever it determined that these standards were being violated. Jeffrey M. Gaba, *Federal Supervision of State Water Quality Standards Under the Clean Water Act,* 36 Vand.L.Rev. 1167, 1178 (1983). This approach was soon found wanting. Enforcement of the standards was almost non-existent. *Id.* at 1179 (only one enforcement action brought before 1972).

There were philosophical difficulties with this approach which approved of pollution up until the point that it caused damage. The Amendments took the position that all discharges were impermissible unless specific authorization, through the discharge permit system, was granted. Whereas earlier legislation focused on the quality of the receiving waters, the 1972 Amendments focused on the quality and nature of the effluent being discharged into those waters, with a goal of reducing and eventually eliminating all discharges.

This change in emphasis to an act geared towards discharge limits is reflected throughout the legislative history. *See, e.g.,* 1972 U.S.C.C.A.N. 3675 ("The legislation recommended by the Committee proposes a major change in the enforcement mechanism of the Federal water pollution control program from water quality standards to effluent limits."). Although the 1972 Amendments retain some role for water quality standards, *see* 33 U.S.C. §§ 1312 and 1313, that role has changed. Prior to 1972, water quality standards served as both the end goal and the mechanism for achieving that goal. Under the 1972 Amendments, water quality standards remain the goal, however discharge limits have taken over as the mechanism. *See* 1972 U.S.C.C.A.N. 3675 ("the basis of pollution prevention and elimination will be the application of effluent limitations. Water

quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement"). Thus "[t]he new law must build upon the existing foundation of water quality standards and employ effluent limitations as a tool for the achievement of those standards." Hearings on H.R. 11896, Before the Comm. on Public Works, 93d Cong. 1st Sess. 1180 (1972) (statement of Hon. William D. Ruckleshaus, Admin., Environmental Protection Agency), *reprinted in* 1 A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1180 (1972) (*hereinafter Legislative History); see also* Sen. Consideration of the Report of the Conference Committee, *reprinted in Legislative History* at 171 (statement of Sen. Muskie) ("To the extent the State may wish to continue an examination of water quality in order to determine if more restrictive effluent limits may be required, this section [1313] will be useful."); 33 U.S.C. § 1312; 1972 U.S.C.C.A.N. 3710 ("the Administrator is under a specific obligation to require that level of effluent control which is needed to implement existing water quality standards without regard to the limits of practicability."); *id.* ("It is not the intent of the committee to in any way restrict the Administrator, or the States from applying higher levels of control than best practicable where necessary to achieve standards established pursuant to the 1965 Act ..."); *id.* at 3712 ("To the extent that water quality standards can be used to generate firm data on necessary effluent-limitations this enforcement tool should be available.").

Congress also emphasized the primacy of discharge limits. For instance Congressman Harsha of Ohio stated during consideration of the conference committee bill that "those individuals were wrong who stated that this [§ 1313] was intended to be a weakening of the effluent limitations approach and a continuation of the old water quality standard based approach to water quality control which did not prove as effective as it could have been." House Consideration of the Rept. of the Conf. Comm. *reprinted in Legislative History* at 246. In fact, to the extent that the EPA's resources required prioritizing, Congress stated that it "should assign secondary priority to this [§ 1313] provision."

Sen. Consideration of the Report of the Conference Committee, *reprinted in Legislative History* at 171 (statement of Sen. Muskie).

The Amendments also ameliorated evidentiary and enforcement problems that were inherent in the earlier legislation. The pre–1972 Act required the government to prove that the defendant's discharges were the cause of water quality violations in receiving waters that might be subject to more than one discharger. *See* Gaba, *supra* at 1179. With discharge limitations, a more objective task was given to the courts. Now in order for a court to determine liability, it need only compare the quality and quantity of the alleged polluter's discharge to the limits set forth in the applicable NPDES permit. If the discharges exceed the permit limits, the discharger has violated the Act; if they do not, there is no violation or liability. Thus, "[a]n alleged violation of an effluent control limitation or standard, would not require reanalysis of technological in [sic] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore an objective evidentiary standard will have to be met by any citizen who brings an action under this section." 1972 U.S.C.C.A.N. at 3745. The enforcement of a general water quality maintenance condition in a permit, however, would require the court to engage in just the subjective analysis of technological considerations that Congress sought to avoid under § 1365. Congress's emphasis on the evidentiary simplicity of enforcement actions precludes the enforcement of water quality standards that have not been translated into effluent discharge limitations.

Practical considerations also militate in favor of an interpretation that does not allow for jurisdiction in this case. Under a water quality based enforcement scheme such as the pre–1972 Act, dischargers faced problems in planning and regulating the legality of their actions because this legality is dependant on natural conditions such as the weather and third parties' discharges. *See* Rodgers at 250. As a practical matter, NWEA's interpretation of § 1365 places dischargers such as the City in the same untenable pre-

1972 position. No matter how much planning the City were to engage in, as long as it discharges effluent from the CSOs even under the auspices of a duly authorized permit, it is in danger of being in violation of the Act. Given the extreme cost of pollution abatement, industry and cities must have the ability to plan for the future with the assurance that if they remain within concrete permit parameters, they will remain on the correct side of the law.

■ Congress's statements in the legislative history that liability determinations under the 1972 amendments would be objective and non-technical, as well as the emphasis on the translation of water quality standards into discharge limitations convinces this court that the single reference to "any condition of any permit" cannot be read as broadly as NWEA suggests without eviscerating Congress's intent to restructure and revamp the statute. Citizens may still object in the state courts to the terms of a proposed NPDES permit when it is issued if they find that the effluent limitations are insufficient to protect and preserve water quality. ORS 183.484(2) (challenge to permit contents must be brought within 60 days of issuance). Given the legislative history and the practical problems that NWEA's interpretation of the statute would entail, the court finds that under 33 U.S.C. § 1365, water quality standards are unenforceable by way of a citizen suit unless they have been translated into end-of-the-pipe effluent limitations. Therefore the district court's holding is affirmed.

## C. PROCEDURAL DETERMINATIONS

In the court below, Portland asserted two other jurisdictional arguments upon which NWEA now seeks a determination. Portland argued that 1) the case was moot because of the changes in the 1991 permit; and 2) any action was barred under 33 U.S.C. § 1319(g)(6) by DEQ's subsequent enforcement actions. Because NWEA claims entitlement to attorney's fees based on the alleged violations of the old permit, and seeks to enforce the water quality standards independently of the effluent limitations, a live and genuine controversy remains, so the case is not moot.

## III. CONCLUSION

We AFFIRM the district court's holdings that the 1984 permit covered the CSOs and that 33 U.S.C. § 1365(a) does not confer jurisdiction for citizen suits to enforce water quality standards when they are conditions of a permit. Accordingly we decline to reach the questions of mootness and whether 33 U.S.C. § 1319 bars jurisdiction.

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all parts of the majority opinion except the finding that Northwest Environmental Advocates ("NWEA") lacks standing to bring a citizen suit under the Clean Water Act ("CWA") § 505(a)(1) [33 U.S.C. § 1365(a)(1) ], to enforce water quality standards contained in NPDES permits. Portland holds an NPDES permit, and the water quality standards are conditions of its permit. Both the plain language of § 1365(a)(1) and case law support a finding of citizen suit jurisdiction in this case, and I am unpersuaded by the majority opinion's reasoning that legislative history and practical considerations preclude jurisdiction. I therefore respectfully dissent.

As the majority opinion points out, the plain language of § 1365(a) authorizes citizens to enforce *all* permit conditions. That section provides: "[A]ny citizen may commence a civil action ... (1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under [the Clean Water Act]...." 33 U.S.C. § 1365(a)(1)(A). An effluent standard or limitation includes "(2) an effluent limitation or other limitation under section 1311 ... *or* (6) a permit or condition thereof...." 33 U.S.C. § 1365(f)(2), (f)(6) (emphasis added). Although this language clearly contemplates citizen suits to enforce "a permit or condition thereof," the majority opinion concludes that the section allows citizens to enforce only those water quality standards that are translated into permit effluent limitations.

To reach what I regard as an erroneous conclusion, the majority opinion, I believe, misconstrues the effect of the legislative his-

tory of the 1972 amendments to the CWA. I agree that the 1972 CWA amendments reflect Congress' dissatisfaction with the system of water quality standards, but nowhere does Congress evidence an intent to *preclude* the enforcement of water quality standards that have not been translated into effluent discharge limitations. The fact that Congress created a new, simpler enforcement method based on effluent limitations does not mean that Congress intended to foreclose citizen suit enforcement of water quality standards. In fact, the legislative history convinces me of just the opposite.

By introducing effluent limitations into the CWA scheme, Congress intended to improve enforcement, not to supplant the old system. In the legislative history, the Senate Committee first outlined the dual purposes of water quality standards: "The standards are intended to function ... [a]s a measure of performance ... [and] to provide an avenue of legal action against polluters. If the wastes discharged by polluters reduce water quality below the standards, actions may be begun against the polluters." S.Rep. No. 414, 92nd Cong., 2nd Sess. 2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3671; 40 C.F.R. § 131.2 (1992) (dual purposes). Next, the Committee expressed dismay over the "almost total lack of enforcement" under the old system that depended exclusively upon water quality standards. 1972 U.S.C.C.A.N. at 3672 ("[O]nly one case has reached the courts in more than two decades."). Given Congress' concern about *non*-enforcement, the majority opinion is incorrect when it takes a narrow view of Congress' broad provision for "citizen participation in the enforcement of control requirements and regulations established under [the CWA]...." *Id.* at 3745.

Moreover, citizen suit enforcement of water quality standards is necessary to complement enforcement of effluent limitations. Water quality standards "often cannot be translated into effluent limitations...." *Id.* at 3675. For example, certain water quality standards cannot be expressed quantitatively, such as those that apply in this case to bacterial pollution, aesthetic conditions, and objectionable matter (scum, oily sleek, foul odors, and floating solids). *See* Or.Admin.R. 340–41–445(2)(f), (*l*), (k). Even after the 1972 amendments, states may adopt similar standards and express water quality criteria "as constituent concentrations, levels, or narrative statements...." 40 C.F.R. 131.3(b) (1992).

Many discharges remain unregulated and primarily subject to water quality standards, despite statutory deadlines for achieving effluent limitations, 33 U.S.C. § 1311(b)(1)(A) (1977 deadline for first-stage effluent limitations on all point source discharges), § 1311(b)(2) (West 1993 Supp.) (1989 deadline for second-stage, more stringent controls). Furthermore, in cases where effluent limitations do apply, they serve only as national, minimum requirements; states may adopt stricter, enforceable water quality standards and limitations. 33 U.S.C. § 1370.

By interpreting § 1365(a)(1) to exclude citizen suit enforcement of water quality standards that are not translated into quantitative limitations, the majority opinion immunizes the entire body of qualitative regulations from an important enforcement tool.[1] The rule is especially troubling in this case, because no effluent limitations cover the discharges from Portland's combined sewer overflows ("CSOs"). Nor can citizens find consolation in their state court remedy of objecting to the contents of a permit within sixty days of its issuance, Or.Rev.Stat. 183.-484(2). Citizens groups such as NWEA might not wish to dispute the issuance or contents of a permit, but to enforce the permit's terms. The majority opinion precludes them from doing so. Qualitative standards are not too difficult for courts to enforce. The majority's decision eliminates the *only* practicable way for citizens to challenge CSO discharges.

---

**1.** Also, the majority opinion's interpretation effectively attributes to Congress an intent to stall citizen suit enforcement of permit terms that specify water quality standards. Congress set deadlines for promulgation of effluent limitations, and therefore, must have anticipated a five-year lag, 1972–1977, before universal applicability of effluent limitations. Nothing in the legislative history indicates that Congress intended to stall citizen enforcement of permit terms until promulgation of effluent limitations.

The legislative history of the amendments neither dictates nor supports this result. In fact, parts of the legislative history reflect Congress' intention to grant *broad* authority for citizen enforcement, consistent with the statutory language. In the legislative history, the Senate Committee expressly stated that *"[i]n addition to violations of section 301(a)* [26 U.S.C. § 1311, Effluent Limitations] citizens are granted authority to bring enforcement actions for violations of ... *any condition of any permit* issued under section 402 [26 U.S.C. § 1342]." 1972 U.S.C.C.A.N. at 3747 (emphasis added). Also, the Committee explained that it modeled the citizen suit provision on the analogous Clean Air Act ("CAA") provision that applies to air pollution permit conditions.[2] *Id.* at 3745.

Finally, the majority opinion overlooks ample case law that supports a finding of citizen suit jurisdiction in this case. The Supreme Court has acknowledged citizen standing, under § 1365(a)(1) and (f)(6), to enforce permit conditions based on both EPA-promulgated effluent limitations and state-established standards. *See E.P.A. v. California*, 426 U.S. 200, 224–25, 96 S.Ct. 2022, 2033–34, 48 L.Ed.2d 578 (1976). By applying § 1365(f)(6), several courts have held that there is jurisdiction under which citizens groups may seek to enforce many kinds of permit conditions besides effluent limitations. In fact, permit conditions that courts commonly enforce under § 1365(a) are not effluent limitations, but rather, requirements for retaining records of discharge sampling and for filing reports. *See, e.g., Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir.1988) ("Simkins' reporting requirements are expressly made conditions of

its permit, and therefore violations of these conditions, by operation of § 1365(f)(6), are violations of an effluent standard or limitation of § 1365(a)."), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989). Other examples of enforceable permit conditions include conditions relating to sewage maintenance, *Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton,* 506 F.Supp. 902 (W.D.Pa.1980), *aff'd* 644 F.2d 995 (3rd Cir.1981), and construction schedules, *Locust Lane v. Swatara Township Auth.,* 636 F.Supp. 534, 539 (M.D.Pa.1986) (rejecting defendant's attempt "to impose a limitation on § 1365 where one is neither supported by the language nor the legislative history"). Finally, citizens groups may enforce even valid permit conditions that regulate discharges outside the scope of the CWA, namely discharges that may never reach navigable waters. *Connecticut Fund For Env't v. Raymark Indus., Inc.,* 631 F.Supp. 1283, 1285 (D.Conn.1986).[3]

Because the statutory language, legislative history, and case law demonstrate that citizens *have* authority to enforce permit conditions stated in terms of water quality standards, I would find that NWEA has standing.

---

**2.** The Clean Air Act ("CAA") provision authorizes citizen suits for alleged violations of "an emission standard or limitation under [CAA] ... [, defined in relevant part as an] emission limitation, standard of performance or emission standard, ... *or any condition or requirement of a permit* under ... [sections of CAA] ... or under an applicable [state] implementation plan." 42 U.S.C. § 7604(a), (f) (emphasis added).

**3.** When this Court and other courts have held that citizens may not enforce water quality standards under § 1365(a)(1), they addressed standards that were *not included in a NPDES permit. Oregon Natural Resources Council v. U.S. Forest*

*Service,* 834 F.2d 842 (9th Cir.1987) (suit to enforce water quality standards allegedly breached by nonpoint sources, which are never regulated by NPDES permits); *McClellan Ecological Seepage v. Weinberger,* 707 F.Supp. 1182, 1200 (E.D.Cal.1988) (finding no citizen suit jurisdiction existed, because "a state water quality standard can constitute an effluent standard or limitation enforceable under section 505 only if it has been incorporated into an NPDES permit"); *Montgomery Envtl. Coalition Citizens Coordinating Comm. on Friendship Heights v. Washington Suburban Sanitary Comm'n,* 607 F.2d 378, 381 (D.C.Cir.1979).