[NOT FOR PUBLICATION]

United States Court of Appeals
For the First Circuit


No. 96-2327

CAPE ANN CITIZENS ASSOCIATION, ET AL.,

Plaintiffs - Appellants,

v.

CITY OF GLOUCESTER, ET AL.,

Defendants - Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]



Before

Torruella, Chief Judge,

Bownes and Cyr, Senior Circuit Judges.



Philip H. Cahalin for appellants.
Madelyn  Morris, Assistant Attorney General, Environmental
Protection Division, with whom George  B.  Henderson  II, Assistant
United States Attorney, was on brief for appellees Commonwealth of
Massachusetts and the United States.
Linda Thomas Lowe , General Counsel, Legal Department, City of
Gloucester, for appellee City of Gloucester.



August 13, 1997


TORRUELLA, Chief Judge. In 1979, the Commonwealth of

Massachusetts ("the Commonwealth") sued the City of Gloucester

("the City") for violating the Massachusetts Clean Water Act, Mass.

Gen. Laws ch. 21, SS 26-53. The City agreed to the entry of a

final judgment that required it, inter  alia, to prepare a

facilities plan to identify and remedy the pollution in North

Gloucester.

In 1989, the United States brought an action in federal

court, alleging that the City was in violation of the Clean Water

Act, 33 U.S.C. S 1252 et seq. (CWA). The Commonwealth intervened

as a party plaintiff and alleged that the City was violating both

the state and federal clean water acts. The complaints in federal

court alleged,  inter alia , that the City was discharging pollutants

into the waters of the United States and the Commonwealth, in

violation of its National Pollutant Discharge Elimination System

("NPDES") permit, issued by the Environmental Protection Agency

pursuant to the Clean Water Act.

In 1991, the City agreed to the entry of a consent

decree. The agreement included a schedule for the design and

construction of an extension of the sewer system to North

Gloucester. The decree was amended several times thereafter. In

1993, it was amended to give the City discretion to use Septic Tank

Effluent Pump ("STEP") sewers rather than a combination of

conventional gravity sewers and pressure sewers.

A STEP sewer system includes STEP tanks located on the
household's property. Household sewage flows into the STEP tank

-2-

The City decided to use STEP sewers in the Annisquam and

Lane's Cove areas in January 1994. The City initially intended to

install all the STEP pumps, tanks, and ancillary equipment needed

to connect individual properties to the collection system. The

decree was amended in 1995 to reflect this decision. When some

homeowners refused to grant the City the easements necessary to

allow the City to install the septic tanks and pumps, the City

offered them the option of doing the work themselves.

As of October 28, 1996, the City had completed the

construction of the main and lateral lines of the STEP sewers in

Annisquam and approximately seventy percent of the lines for Lane's

Cove.

Plaintiffs-appellants, the Cape Ann Citizens Association,

initiated suit in Massachusetts Superior Court in February 1996.

After the suit was brought, the City amended its regulations to

allow individual owners to install and maintain their own STEP

tanks without conveying an easement to the City.

The City removed the action to federal district court.

The Commonwealth and the United States intervened as defendants.

Treating the matter as a case stated on the pleadings, the district

where it receives primary treatment, essentially consisting of the
sludge's settling to the bottom of the tank and being digested by
bacteria. The sludge-reduced liquid effluent then flows under
pressure to the STEP sewer line and to the city treatment plant.
The sewer lines serving STEP sewers are narrower than the lines
serving conventional gravity sewers. Conventional gravity sewers
convey wastewater, including both liquids and solids, to the
treatment plant by means of gravity. Pressure sewers include pumps
that grind the sewage before it is transported under pressure to
the collection system.

-3-

court ruled for the City. The plaintiffs now appeal on a variety

of grounds. We affirm. 

I. Validity of Consent Decree

Appellants present several theories in an attempt to have

the 1991 consent decree declared void. None of their arguments are

persuasive.

First, they claim that they have standing to challenge

the consent decree under federal law. We need not decide the

standing issue as the government agrees that appellant has

standing. Assuming arguendo that appellants have standing, we

would normally turn to examine the substance of their claim

regarding the consent decree. They have, however, failed to put

forward a federal claim for relief. They argue only the standing

issue, omitting any discussion of a substantive federal claim.

In the absence of a federal claim, we consider the state

law claim advanced by appellants. The only state law claim

presented is based on Mass. Gen. Laws ch. 40, S 53. In relevant

part, the statute reads:

If a town . . . [is] about to raise or
expend money or incur obligations
purporting to bind said town for any
purpose or object or in any manner other
than that for and in which such town has
the legal and constitutional right and
power to raise or expend money or incur
obligations, the supreme judicial court
may, upon the petition of not less than

The district court also agreed that appellants had standing to
challenge the consent decree on the grounds that the defense of
lack of standing was waived when the case was removed to federal
court.

-4-

ten taxable inhabitants of the town,
determine the same in equity, and may,
before the final determination of the
cause, restrain the unlawful exercise or
abuse of such corporate power.

Mass. Gen. Laws ch. 40, S 53.

Appellants' claim fails because it has been brought too

late. It is well settled that Mass. Gen. Laws ch. 40, S 53 is

preventative. "The statute does not authorize the correction of

wrongs wholly executed and completed. It is not retroactive."

Fuller v.  Trustees of Deerfield Academy & Dickinson High Sch. , 252

Mass. 258, 259 (1925). Actions under the statute must be brought

before obligations are incurred. Kapinos v. Chicopee, 334 Mass.

196, 198 (1956). In Kapinos, the court found that petitioners were

not entitled to relief under Mass. Gen. Laws ch. 40, S 53 because

"the construction companies had practically completed their work

under the contract when this petition was brought." Id. at 199.

The construction of the sewers required under the consent

decree is similarly advanced. It is undisputed that of

approximately 510 homes that must be connected, approximately 450

had been connected as of September 1996. Of those that remain,

some will not need to be connected because they have adequate on-

site systems. Appellants do not dispute that the sewer system is

almost completed. We find, therefore, that Mass. Gen. Laws ch. 40,

S 53 does not offer appellants an avenue for relief.

Appellants next claim that the consent decree was void on

the ground that it was entered into by the mayor  ultra vires . The

district court disagreed, stating that "under the city charter of

-5-

the City of Gloucester, the mayor of the city as the city's chief

executive officer was empowered, at least on its face, to enter

into the consent decree." Transcript of Hearing, October 28, 1996,

at 56.

We need not decide the issue, however, because, although

appellants discuss their standing to bring such a claim, they fail

to argue the merits of their ultra vires claim.

It is well settled that this court will consider only

those arguments that have been properly briefed and put before it. 

[I]ssues adverted to in a perfunctory
manner, unaccompanied by some effort at
developed argumentation, are deemed waived
. . . . It is not enough merely to
mention a possible argument in the most
skeletal way, leaving the court to do
counsel's work . . . . Judges are not
expected to be mindreaders. Consequently,
a litigant has an obligation to spell out
its arguments squarely and distinctly, or
else forever hold its peace.

Willhauck v. Halpin, 953 F.2d 689, 700 (1st Cir. 1991) (citations

omitted);  see also  Ramos v.  Roche Prods. , 936 F.2d 43, 51 (1st Cir.

1991) (brief must contain full statement of issues presented and

accompanying arguments). Appellants have failed to provide us with

argument that supports their  ultra vires claim and, accordingly, we

consider that claim to have been waived.

II. Did the Consent Decree Violate the CWA?

The federal and state clean water acts are administered

through a permitting system called the National Pollutant Discharge

Elimination System ("NPDES"). Under this system, owners of point

-6-

sources must obtain an NPDES Permit. Pursuant to the Clean Water

Act, 33 U.S.C. S 1251-1387, the EPA issued the City an NPDES

permit.

Appellants claim that the consent decree is inconsistent

with the Clean Water Act because the NPDES permit conditions

governing the Gloucester storm drains were not developed in

conformity with the Act's regulatory scheme. Because the effluent

limitations in the NPDES permit were based upon water quality

standards rather than the effluent limitations guidelines

promulgated by the EPA, appellants argue that the limits in the

permit are unenforceable.

Appellants' argument is that "reliance on water quality

data alone to enforce the construction of a sewer was inconsistent

with the enforcement scheme carefully developed under the Clean

Water Act and deprived the district court of jurisdiction of the

enforcement action." Appellants' Brief at 11. In other words,

appellants argue that only specific effluent limitations stated in

A "point source" is "any discernible, confined and discrete
conveyance, including but not limited to any pipe, ditch, channel,
tunnel, conduit, well, discrete fissure, container, rolling stock,
concentrated animal feeding operation, or vessel or other floating
craft, from which pollutants are or may be discharged." 33 U.S.C.
S 1362(14).

The permit was originally issued in 1975 and was reissued in
1985.

Effluent limitations refer to restrictions on the quantities,
rates and concentrations of pollutants which are discharged from a
point source. Water quality based standards limit discharges based
on the desired conditions of a particular waterway. See Arkansas
v. Oklahoma, 503 U.S. 91, 101 (1992).

-7-

the NPDES permit, and not water quality data, can be enforced by

courts. In support of this argument, appellants cite Northwest

Environmental  Advocates v. City  of  Portland, 11 F.3d 900, 906-10

(9th Cir. 1993). That case, however, was subsequently vacated by

the Ninth Circuit in Northwest Environmental Advocates v. City of

Portland, 56 F.3d 979, 981 (9th Cir. 1995), cert.  denied, 116 S.

Ct. 2550 (1996). In the latter opinion, the Ninth Circuit

concluded, in light of  PUD No. 1 of Jefferson County v.  Washington

Department of Ecology , 511 U.S. 700 (1994), that "[b]y introducing

effluent limitations into the CWA scheme, Congress intended to

improve enforcement, not to supplant the old system." Northwest

Environmental Advocates , 56 F.3d at 986. "[N]owhere does Congress

evidence an intent to preclude the enforcement of water quality

standards that have not been translated into effluent discharge

limitations." Id. Furthermore, in PUD No. 1 of Jefferson County ,

the Supreme Court held that the Clean Water Act allows states to

enforce broad water quality standards. Id. at 713-21.

In an attempt to rescue their claim, appellants' seek to

demonstrate that the CWA is intended to take into account the costs

of eliminating the discharge of pollutants. Even assuming that

appellants' view of the goals of the CWA is correct, they have

nevertheless failed to demonstrate that the consent decree violated

the Act. Appellants fail to show that it is impermissible for

consent decrees to consider water quality standards. They have

also failed to show that the goals of the CWA were ignored when the

consent decree was established. We do not believe, as appellants'

-8-

position would require, that a consent decree must enumerate the

objectives of the CWA and state that it has taken each into

account. Thus, appellants offer little more than a vacated case,

Northwest  Environmental  Advocates, 11 F.3d at 906-10, and a

generalized discussion of the goals of the CWA. We find this

insufficient to establish that the consent decree violates the CWA.

III. Connection to Common Sewer

Appellants' next argument alleges that the City's Board

of Health lacked the authority to order a landowner to connect to

the STEP sewer unless and until the City had installed the STEP

tank on the landowner's property.

The Board of Health is explicitly granted the authority

to order connection to a common sewer:

The board of health of a town may require
the owner or occupant of any building upon
land abutting on a public or private way,
in which there is a common sewer, to
connect the same therewith by a sufficient
drain . . . .

Mass. Gen. Laws ch. 83, S 11.

Appellants argue that the STEP sewer system is not a

"common sewer" for the purpose of section 11 because the sewer

system requires, in order to function, the pressure supplied by the

individual STEP tanks and requires the pretreatment of sewage

provided by these tanks. Accordingly, the argument goes, the STEP

tanks are an integral part of the STEP sewer and must be installed

before the board of health is empowered to order connection under

section 11.

-9-

In the absence of relevant Massachusetts case law, we

find that this argument runs counter to the common sense reading of

the term "common sewer." The requirement of pretreatment certainly

cannot undermine the authority to order connection under section

11. It is no less a "common sewer" merely because some treatment

takes place in the STEP tank -- sewage is still sent through a set

of shared pipes to a treatment plant. Similarly, the fact that

pressure from the STEP tanks is required for the sewage system to

operate does not render it something other than a "common sewer."

No authority is cited by appellants for the proposition that the

need for pressure from the STEP pumps implies that there is no

"common sewer" prior to the STEP tank connection. A sound

interpretation of "common sewer" would include the STEP sewer

system at issue in which a set of common pipes transport sewage

from individual properties to a common treatment facility.

Without any support for appellants' argument, we are

unwilling to accept their creative interpretation of state law,

which would add unprecedented nuances to the plain meaning of the

statute. See Doyle v. Hasbro, 103 F.3d 186, 192 (1st Cir. 1996)

(stating that this court must exercise caution when considering a

new application of state law, and that we will not do so without a

strong argument in favor of the desired application).

IV. The Takings Claim

Appellants argue that the regulations requiring the grant

of an easement to the City in exchange for the City's installation

-10-

of the STEP tanks on homeowners' properties violate the Takings

Clause of the Fifth Amendment.

The Takings Clause of the Fifth Amendment, made

applicable to the States through the Fourteenth Amendment, see

Chicago,  B.  &  Q.R.  Co. v. Chicago, 166 U.S. 226, 239 (1897),

provides: "[N]or shall private property be taken for public use,

without just compensation." One of the purposes of the Takings

Clause is "to bar Government from forcing some people alone to bear

public burdens which, in all fairness and justice, should be borne

by the public as a whole." Armstrong v. United  States, 364 U.S.

40, 49 (1960).

On the other hand, the authority of state and local

governments to engage in land use planning has been sustained

against constitutional challenge. Euclid v.  Ambler Realty Co. , 272

U.S. 365 (1926). "Government hardly could go on if to some extent

values incident to property could not be diminished without paying

for every such change in the general law." Pennsylvania Coal Co.

v. Mahon, 260 U.S. 393, 413 (1922). 

It is within the power of government to enact land-use

regulation, and such regulation does not effect a taking if it

"'substantially advance[s] legitimate state interests' and does not

den[y] an owner economically viable use of his land." Nollan v.

California Coastal Comm'n , 483 U.S. 825, 834 (1987) (quoting  Agins

v. Tiburon, 447 U.S. 255, 260 (1980)). "States have broad

authority to regulate housing conditions."  Loretto v.  Teleprompter

Manhattan  CATV  Corp., 458 U.S. 419, 440 (1982). It follows that

-11-

the state is entitled to regulate the disposal of sewage in order

to protect the public health and to prevent conditions that amount

to a nuisance. See Town of Holden v. Holden Suburban Supply Co.,

343 Mass. 187, 187 (1961). Every community must find some

mechanism to dispose of its sewage. To do so effectively, a sewer

system of some form is required, and connection to that system can

be mandated without there being a taking.

In the instant case, the City's regulation governing the

disposal of sewage can be satisfied in one of three ways. First,

the homeowner can demonstrate that the sewage treatment on his or

her property provides no point source pollution and is in

compliance with municipal and state regulations governing sewage

systems. Second, the homeowner can install a STEP system at his or

her own expense. Third, the homeowner can allow the City to

install and maintain the STEP system at its expense upon the

granting of an easement allowing the City to come upon the land.

In Loretto, the Supreme Court found a taking where New

York law required a landlord to allow the installation of cable

facilities on his premises. The basic rule applied in Loretto is

that "a permanent physical occupation authorized by government is

a taking." 458 U.S. at 426. The Court added that "[s]o long as

the[] regulations do not require the landlord to suffer the

physical invasion of a portion of his building by a third party,

they will be analyzed under the multifactor inquiry generally

applicable to nonpossessory government activity." Loretto, 458

U.S. at 440 (citing Penn  Central  Transp.  Co., 438 U.S. 104). By

-12-

implication, where there is a permanent physical invasion by the

government or a third party, there will normally be a taking.

The instant case, however, does not fall under the

permanent physical invasion rule of Loretto. The important

distinction is explained in footnote 19 of Loretto, which states:

If S 828 required landlords to provide
cable installation if a tenant so desires,
the statute might present a different
question from the question before us,
since the landlord would own the
installation. Ownership would give the
landlord rights to the placement, manner,
use, and possibly the disposition of the
installation. The fact of ownership is,
contrary to the dissent, not simply
"incidental," it would give a landlord
(rather than a CATV company) full
authority over the installation except
only as government specifically limited
that authority. The landlord would decide
how to comply with applicable government
regulations concerning CATV and therefore
could minimize the physical, esthetic, and
other effects of the installation.
Moreover, if the landlord wished to
repair, demolish, or construct in the area
of the building where the installation is
located, he need not incur the burden of
obtaining the CATV company's cooperation
in moving the cable.

Id. at 440 n.19.

In the instant case, the homeowner has the option of

installing and owning the STEP tanks if the homeowner does not want

the City to do so. This option distinguishes the case from

Loretto. Because the City could simply order homeowners to connect

to the sewer, which would not be a taking, giving them the

additional option of having the City perform the installation does

not render the regulation a taking.

-13-

Appellants make much of their claim that even if the

system is privately installed, "ownership" of the tanks remains

with the City. In fact, appellants appear to concede that there is

no taking if the object placed on the homeowner's property is owned

by the homeowner. "The critical distinction in  Loretto between use

regulations, which are ordinarily noncompensatory, and a 'permanent

physical occupation of property,' which is always compensatory, is

the ownership and control of the object placed on the homeowner's

property." Appellants' Brief at 14.

Appellants' argument that the STEP tanks are not

privately owned is as follows:

The only practical difference between STEP
tanks which are considered privately owned
. . . and maintained and those which are
not is in the identity of the installation
and maintenance people. It would seem
more would be required to distinguish
ownership and control. The tanks clearly
perform a public function. The tanks are
integral components in the city's sewer.
The city's sewer cannot perform its
function without the tanks.

Appellants' Brief at 14.

Appellants have not, however, offered any practical

method for distinguishing a privately owned installation and a

publicly owned one. We are not convinced by appellants' claim that

STEP sewers are different from other sewers because the STEP tanks

are required for the system to operate. It is true that the STEP

tanks perform the necessary function of allowing solids to settle

out of the wastewater before the latter is discharged into the

collection system. This function, however, is for the benefit of

-14-

the homeowner alone. The tank is simply a requirement imposed on

the homeowner so that the homeowner's property can be connected to

the sewer system. As such, it is not a taking. Rather, it is a

reasonable requirement without which the property could not be

connected to the sewer.

We believe that the option of installing and maintaining

the STEP system oneself provides the homeowner ownership of the

STEP tank. As discussed in footnote 19 of  Loretto, the homeowner's

ability to install the system himself or herself grants the

homeowner "full authority over the installation except only as

government specifically limited that authority." Id. at 440 n.19.

For this reason, and consistent with Loretto, we find

that the regulations do not work a taking.

V. The Easement

Appellants claim that even if there is no taking, there

is no need for the City to demand an easement in exchange for one

dollar in order to install the STEP tanks. In support of this

claim, they cite Mass. Gen. Laws ch. 83, S 1, which allows a city

to take an easement by eminent domain if necessary for the

construction and maintenance of common sewers. The STEP tanks,

however, are not part of a "common sewer," as required by Mass.

Gen. Laws ch. 83, S 1. Rather, they are part of a "particular

sewer" which is governed by Mass. Gen. Laws ch. 83, SS 3 and 24.

See P  &  D  Service  Co. v. Zoning  Board  of  Appeals  of  Dedham, 359

Mass. 96, 101 (1971) (stating that the line connecting a building

to a municipal sewer system is a "particular sewer"). The sewer

-15-

system is, as discussed supra, a common sewer. The STEP tank,

however, is more accurately characterized as part of the line

connecting a property to the municipal sewer. Sections 3 and 24 do

not authorize municipalities to take an easement by eminent domain

for the construction of particular sewers. Furthermore, appellants

appear to admit that an easement is required. "Early on it became

apparent that easements would be necessary for the installation and

maintenance of city-owned utilities on private property."

Appellants' Brief at xii.

VI. Vagueness

Finally, appellants claim that the regulations are void

for vagueness. Having reviewed the regulations, we find this

argument to be without merit. In our view, a person "of ordinary

intelligence" is able to understand the meaning of these

regulations. United  States v. Batchelder, 442 U.S. 114, 122

(1979);  Doe v.  Superintendent of Schs. of Worcester , 421 Mass. 117,

134 (1995).

VII. State Law Issues

Two additional issues are raised by appellants: First,

that the most the Board of Health can fine a landowner for failure

to obey an order to connect to the sewer is $200 and, second, that

the City must install the STEP tanks when requested to do so by the

homeowner. These issues were not reached by the district court.

In its ruling from the bench, the district court stated that "as to

any aspects of the case not adjudicated by the declaration from the

bench . . . the cause is remanded to the Massachusetts Superior

-16-

Court." Judgment of the District Court, October 28, 1996. Because

appellants do not challenge the propriety of the remand order, we

will not consider their arguments on the merits. Accordingly, we

leave these issues to the Massachusetts Superior Court.

VIII. Conclusion

For the reasons stated herein, we  affirm  the judgment of

the district court. Costs to appellees.

-17-