United States Court of Appeals,

Eleventh Circuit.

Nos. 94-8402, 94-8855.

Terence D. HUGHEY, Plaintiff-Appellee,

v.

JMS DEVELOPMENT CORPORATION, Defendant-Appellant.

Terrence D. HUGHEY, Plaintiff-Appellee, Cross-Appellant,

v.

JMS DEVELOPMENT CORPORATION, Defendant-Appellant, Cross-Appellee.

April 1, 1996.

Appeals from the United States District Court for the Northern District of Georgia. (No. 1:92-CV-2051-RHH), Robert H. Hall, Judge.

Before ANDERSON and CARNES, Circuit Judges, and OWENS[*], District Judge.

OWENS, District Judge:

## I. INTRODUCTION

Appellant JMS Development Corporation ("JMS") is the developer of a 19.2-acre residential subdivision in Gwinnett County, Georgia. Appellee Terence D. Hughey ("Hughey") is a Gwinnett County homeowner admittedly opposed to all development in Gwinnett County, one of metropolitan Atlanta's fastest growing areas. Hughey's first effort to prevent development of JMS's residential subdivision was an unsuccessful suit in state court filed during the course of construction. After the subdivision had been completed, Hughey sued JMS in United States District Court alleging that JMS's completed subdivision was continuing to violate the

---

[*]Honorable Wilbur D. Owens, Jr., U.S. District Judge for the Middle District of Georgia, sitting by designation.

Clean Water Act by allowing storm (rain) water runoff without possessing a National Pollutant Discharge Elimination System ("NPDES") permit setting forth the conditions under which storm (rain) water could be discharged.

The undisputed evidence showed that JMS submitted its subdivision plans and specifications to Gwinnett County for approval and on March 31, 1992, obtained a county permit to begin construction. The undisputed evidence further showed that a Clean Water Act NPDES permit was not then available in the State of Georgia from the only agency authorized to issue such permits—Georgia's Environmental Protection Division. The district court nevertheless found that the Clean Water Act absolutely prohibited the discharge of any storm (rain) water from JMS's completed subdivision in the absence of an NPDES permit. Relying on this finding and rejecting the uncontroverted testimony that some storm (rain) water discharge beyond the control of JMS would naturally occur whenever it rained, the district court issued permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65(d). The injunction ordered that JMS "not discharge stormwater into the waters of the United States from its development property in Gwinnett County, Georgia, known as Rivercliff Place if such discharge would be in violation of the Clean Water Act."

The district court also fined JMS $8,500 for continuing violations of the Clean Water Act and awarded Hughey more than $115,000 in attorney fees and costs under 33 U.S.C. § 1365(d). From those orders and judgment of the district court, JMS appeals.

II. BACKGROUND

*A. The Clean Water Act*

In 1972 Congress passed the Clean Water Act ("CWA") amendments, 33 U.S.C. §§ 1251-1387, to remedy the federal water pollution control program which had "been inadequate in every vital aspect" since its inception in 1948. *EPA v. State Water Res. Control Bd.,* 426 U.S. 200, 203, 96 S.Ct. 2022, 2024, 48 L.Ed.2d 578 (1976). The amended CWA absolutely prohibits the discharge of any pollutant by any person, *unless* the discharge is made according to the terms of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a). This "zero discharge" standard presupposes the availability of an NPDES permit, allowing for the discharge of pollutants under the conditions set forth in the permit. *Id.* § 1342(a)(1). NPDES permits are usually available from the Environmental Protection Agency ("EPA"); however, 33 U.S.C. § 1342(c)(1) suspends the availability of federal NPDES permits once a state permitting program has been submitted and approved by the EPA. Thus, if a state administers its own NPDES permitting program under the auspices of the EPA, applicants must seek an NPDES permit from the state agency. *See* 33 U.S.C. § 1342(c)(1); *Gwaltney v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

On June 28, 1974, the State of Georgia was authorized by EPA to administer an NPDES program within its borders. The Georgia agency responsible for administration of that program is the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources. EPA-issued NPDES permits are thus not

available in Georgia.

Even though the absolute prohibition in Section 1311(a) applied to storm water discharges, for many years the discharge of storm (rain) water was a problem that the EPA did not want to address.[1] The EPA complained that administrative concerns precluded a literal application of the CWA's absolute prohibition—if the CWA applied to storm (rain) water discharges, the EPA would be required to issue potentially millions of NPDES permits. Years of litigation ensued when the EPA promulgated NPDES permit regulations exempting uncontaminated storm water discharges from the CWA. *See, e.g., Costle, supra* note 1.

The congressional response to this baffling situation was the Water Quality Act, Pub.L. No. 100-4, 101 Stat. 7 (1987) (codified as amended in scattered sections of Title 33 U.S.C.), which amended the CWA to provide specifically that "storm water" discharges were within the CWA's proscription. *See* 33 U.S.C. § 1342(p). Because of the administrative nightmare presented by the inclusion of storm (rain) water discharges, Congress chose a phased-in approach. "The purpose of this approach was to allow EPA and the states to focus their attention on the most serious problems first." *NRDC v. EPA*, 966 F.2d 1292, 1296 (9th Cir.1992).

The phased-in approach established a moratorium until October

---

[1]Under the CWA, the term "pollutant" is inclusive of "rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6). When rain water flows from a site where land disturbing activities have been conducted, such as grading and clearing, it falls within this description. *See, e.g., Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1377 (D.C.Cir.1977); 40 C.F.R. § 122.2 (defining pollutant).

1, 1992, on requiring permits for most storm water discharges. *Id.;* Water Quality Act, § 402(p), 33 U.S.C. § 1342(p). However, "discharge[s] associated with industrial activity"[2] were excepted from this moratorium. Water Quality Act, § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B). Section 402(p)(2)(B) required the EPA no later than February 4, 1989, to establish regulations setting forth permit application requirements for industrial storm water discharges. Those seeking such permits were to file an application no later than February 4, 1990, and permit applications were to be rejected or accepted by February 4, 1991. *Id.*

EPA failed to meet the statutory timetable, so it extended the deadline for submitting a permit application until October 1, 1992. The Natural Resources Defense Council ("NRDC") sued the EPA for granting this extension. The Ninth Circuit Court of Appeals granted NRDC's request for declaratory relief, but denied injunctive relief, stating the "EPA will duly perform its statutory duties." *NRDC v. EPA,* 966 F.2d at 1300. On September 3, 1992, the EPA confirmed the Ninth Circuit's faith by issuing its final general permits for storm water discharges associated with industrial activity; applicants were to submit their request for

---

[2]Under EPA guidelines, "storm water discharge associated with industrial activity" is inclusive of construction activity, which is in turn defined as "clearing, grading and excavation activities except: operations that result in the disturbance of less than five acres of total land area which are not part of a larger common plan of development or sale." 40 C.F.R. § 122.26(b)(14)(x). This regulation, to the extent it sought to exempt from the definition of "industrial activity" construction sites of less than five acres, was invalidated on the grounds that it was arbitrary and capricious. *NRDC v. EPA,* 966 F.2d 1292, 1305-06 (9th Cir.1992). Even so, the regulation still provides that industrial activity is inclusive of construction.

a permit by no later than October 1, 1992.

Since a state agency's action in advance of that taken by the EPA might be disapproved as inconsistent with the EPA's eventual position, Georgia EPD has always followed the EPA's lead in the promulgation of NPDES permits. *See generally* Georgia EPD's Amicus Brief, at 5. Consistent with this approach, Georgia EPD began the public notice portion of the storm (rain) water discharge permit promulgation process only after the EPA had acted. On September 23, 1992, less than one month after the EPA had issued its general permits, Georgia EPD issued public notice of its intent to issue two general permits, one of which would cover storm water discharges from construction activities involving land-disturbing activities of five acres or more. An affidavit from the section chief of Georgia EPD's Water Protection Branch summarized the state of the law in Georgia up to that time: "[N]o NPDES program for issuing NPDES permits has been in place [in Georgia] for storm water runoff from construction activities."

*B. The JMS Residential Subdivision*

In early 1992—when NPDES permits covering storm (rain) water were not available in Georgia—JMS planned to develop its 19.2-acre residential subdivision and for that purpose submitted its plans and specifications to Gwinnett County. In developing these plans and specifications, JMS hired a firm of consulting engineers, who were to supervise the design and control of sedimentation control measures and help ensure that JMS remained in compliance with relevant pollution control requirements.

On March 31, 1992, JMS received a permit from Gwinnett County

authorizing it to conduct land-disturbing activities.[3] In accordance with requests from state and county officials, JMS spent more than $30,000 installing state of the art sedimentation control devices, including silt fences, check dams, vegetation, sloping, and a sedimentation retention basin. The erosion and sedimentation control measures met or exceeded Gwinnett County's requirements.

Prior to beginning construction, JMS had done everything possible to comply with the legal requirements of building a small residential subdivision. On the county level, County Inspector George Michael Fritcher deposed that JMS was in compliance; at the state level, David Word, Chief of EPD's Water Protection Branch, stated that EPD would not (could not) have done anything with respect to an NPDES permit for storm water discharges even if JMS had applied for one prior to beginning the development; and at the federal level resort to the EPA was foreclosed to JMS because, as noted, Georgia's NPDES program exists in lieu of the federal NPDES program.

With Gwinnett County's blessing, JMS began to clear, grade, and grub the property for the construction of streets, gutters, and storm sewers. JMS channelled its discharge of rain water as dictated by the county permit requirements. The discharges that

---

[3]According to David Tucker, Development Review Manager for Gwinnett County, this permit served as "authorization for land-disturbing activity as required by the Development Regulations of Gwinnett County[, which] has the authority to administer [Georgia's] Soil Erosion and Sedimentation Control Act of 1975 in Gwinnett County. As part of this permitting procedure, JMS Development Corporation submitted a soil erosion and sedimentation control plan which was approved by the Gwinnett County Planning and Development." *See also* Billew Affidavit; Ballard Affidavit (exh. A).

occurred, as noted by the district court, were minimal and posed "no threat to human health." Further, much of the damage caused by the discharges would have been "reversed with the passage of a relatively short amount of time." Within this 19.2-acre subdivision, approximately 4.64 acres were disturbed by actual construction of storm sewers, curb, guttering, and streets.

Once all subdivision construction had been completed and the storm sewers, curbing, guttering, and streets had been dedicated or conveyed to Gwinnett County, a plat of the completed subdivision showing approval by Gwinnett County's various agencies was recorded in the land records of Gwinnett County on August 6, 1992. JMS was from this point forward engaged in no further construction or land disturbing activities.

*C. Hughey's Clean Water Act Civil Action*

On August 28, 1992, Hughey sued JMS under the citizen's suit provision of the Clean Water Act, 33 U.S.C. § 1365,[4] alleging that JMS had violated the CWA by discharging storm (rain) water from a "point source" on its property into "the waters of the United States" without an NPDES permit. *See* 33 U.S.C. §§ 1311, 1342. Hughey alleged that JMS's discharges of storm (rain) water were in association with industrial activity. *See* 40 C.F.R. § 122.26(b)(14)(x) (industrial activity includes construction, which

---

[4]Section 1365(a) authorizes any citizen to "commence a civil action on his own behalf—(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter...." The section further provides that "effluent standard or limitation" is inclusive of "an unlawful act under subsection (a) of section 1311 of this title." Section 1311(a) makes it unlawful to discharge *any* pollutant without an NPDES permit.

in turn encompasses clearing, grading, and grubbing). Because JMS's construction activities were considered "industrial" by EPA regulations, Hughey contended that JMS was required to have an NPDES permit. *See* Water Quality Act, Section 402(p)(2)(B) (establishing permit deadline for discharges associated with industrial activities). To the extent JMS had discharged without a permit, Hughey argued that JMS was subject to the "zero discharge" standard imposed by Section 1311(a). Hughey's complaint sought a declaratory judgment that JMS was liable under the CWA, as well as injunctive relief against JMS in several forms. Contemporaneously with his complaint Hughey filed a motion for a temporary restraining order ("TRO"), which the court granted after hearing from both sides on August 31, 1992.

Hughey's factual allegations were that JMS's activities caused two watercourses to become muddied during rainfall events.[5] The first of these watercourses is a small stream[6] that originates on JMS's property and traverses neighboring land for close to nine hundred (900) feet before emptying into the Yellow River, which is the second flow of water involved. Twenty-eight hundred (2800) feet below the stream's confluence with the Yellow River lives Mr.

---

[5]The court notes as an aside that a question of fact existed concerning the degree to which JMS was responsible for increased turbidity levels in these two watercourses during rainfall events. This pivotal question of fact was not decided by a jury as demanded by JMS, but rather by the district judge. *See infra* note 13.

[6]At least one expert at trial described the stream as a wet weather flow, and indeed, JMS's consulting engineer stated in his affidavit that United States Geological Survey Maps do not even delineate this unnamed tributary as a stream at all. JMS described the stream as ranging from three to seven feet in width.

Hughey, who owns and resides on land abutting the Yellow River.

JMS initially responded to the complaint with a motion to dissolve the TRO and a motion for summary judgment. JMS conceded that rain water had run off its property and that it did not have an NPDES permit authorizing discharges under the CWA. However, JMS showed that no such permit was available from any government agency and that it had in fact obtained every permit that was available prior to initiating construction.[7] JMS then answered the complaint denying liability under the CWA and demanding a jury trial.

On November 9, 1992, the district court denied JMS's motions to dissolve the TRO, to dismiss the complaint, and for summary judgment. The district court granted Hughey's motion for preliminary injunctive relief, finding that JMS was potentially liable for storm (rain) water discharges made subsequent to October 1, 1992. The preliminary injunction prohibited JMS from

---

[7]The consulting engineers hired by JMS, in addition to seeking (and obtaining) county land disturbing permits, eventually applied for an NPDES permit from Georgia EPD on September 28, 1992, after Hughey had filed this action. Georgia EPD responded by saying no action would (could) be taken with respect to the notice of intent. David Word, Chief of the Water Protection Branch of Georgia EPD, commented on the effect of JMS's application:

> EPD has received a notice of intent to comply with the general permit from JMS Development Corporation for its subdivision in Gwinnett County, Georgia. No action will be taken on this notice of intent until a general permit becomes effective. Therefore, at this time [10/8/92], *no further action is required or necessary on the part of JMS Development Corporation to be authorized to discharge storm water into waters of the State of Georgia from the subject property.*

Word Aff., at ¶ 10 (emphasis supplied). Georgia EPD simply did not have a permit to issue, either before, during, or after the subdivision's development. JMS presented this evidence to the district court in its motion to dismiss.

"discharg[ing] storm water into waters of the United States from its development property in Gwinnett County, Georgia, known as Rivercliff Place, without a National Pollutant Discharge Elimination System permit permitting such discharge."

More than one year later, on December 15, 1993, the district court found JMS liable under the CWA for storm (rain) water discharges into the stream on thirteen dates in 1992—June 8, 14, 30; July 1, 2; August 13, 16; September 4, 5, 27, 28; and October 4, 8. The court further found that JMS once, on June 8, 1992, discharged storm water into the Yellow River itself. These violations according to the district court were continuing (albeit minimal), *see* Order of 2/24/94, at 4, 8, and became the basis for the court's permanent injunction several months later, which issued on February 24, 1994.[8] Defendant in that order was instructed not to

discharge stormwater into the waters of the United States from

_____

[8]Although Georgia EPD stated in its amicus brief to the district court on October 27, 1992, that it expected to issue general NPDES permits covering storm (rain) water discharges by December 1992, such a permit was still not available as of the date on which the district court granted permanent injunctive relief.

Georgia EPD did issue its general permit; however, Mr. Hughey appealed the issuance of that permit in a separate action to the Board of Natural Resources for the State of Georgia, alleging both procedural and substantive defects in the general permit.

The administrative law judge remanded the permit to the Director of Georgia EPD because of Georgia EPD's failure to comply with procedural rules. In addition, the ALJ noted that a remand was also necessary for the Director to consider turbidity levels for storm (rain) water discharges. Due to Mr. Hughey's appeal, there was still no NPDES permit available in Georgia for the discharge of storm (rain) water when the district court entered the permanent injunction.

its development property in Gwinnett County, Georgia, known as Rivercliff Place *if such discharge would be in violation of the Clean Water Act.*

(emphasis supplied). On account of JMS's specific violations of the CWA, the district court required JMS to pay $8,500 in civil penalties to Hughey.[9] Lastly, the court ordered JMS to pay Hughey more than $115,000 in attorney fees and costs pursuant to 33 U.S.C. § 1365(d).

## III. ISSUES ON APPEAL

JMS argues that the broad, generalized language of the injunction, which in effect says nothing more than to "obey the law," is violative of the standard of specificity required by Federal Rule of Civil Procedure 65(d). JMS's second contention is that it should not be punished for failing to secure an NPDES permit when no such permit was available. Finally, JMS objects to the award of attorney fees and costs.[10] JMS has not objected, however, to the fact that it did not receive a jury trial on the question of liability.

## IV. STANDARD OF REVIEW

Although the grant of permanent injunctive relief is generally reviewed for an abuse of discretion, "if the trial court misapplies the law we will review and correct the error without

---

[9]Hughey concedes that requiring payment of civil penalties to him was clear error by the district court. Civil penalties under the Clean Water Act can only be paid to the United States Treasury. *Atlantic States Legal Foundation v. Tyson Foods,* 897 F.2d 1128, 1131 n. 5 (11th Cir.1990).

[10]Hughey filed a cross appeal complaining that $115,000 was an insufficient award. When JMS was forced into bankruptcy, the cross appeal was automatically stayed under 11 U.S.C. § 362. *See* Appellee's Brief, at xiv n. 1. For the reasons that follow, we need not consider the merits of that appeal.

deference to that court's determination." *Wesch v. Folsom,* 6 F.3d 1465, 1469 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 696, 126 L.Ed.2d 663 (1994). *See also Guaranty Fin. Svcs., Inc. v. Ryan,* 928 F.2d 994, 998 (11th Cir.1991) ("if the court misapplied the law in making its decision [to grant the preliminary injunction] we do not defer to its legal analysis"). We review questions of law de novo. *Bechtel Const. Co. v. Secretary of Labor,* 50 F.3d 926, 931 (11th Cir.1995).

## V. DISCUSSION

*A. Liability Under the Clean Water Act*

As noted, the CWA imposes a "zero discharge" standard in the absence of an NPDES permit. 33 U.S.C. § 1311(a). The question is whether Congress intended for this zero discharge standard to apply in the circumstances of this case.

In interpreting the liability provisions of the CWA we realize that Congress is presumed not to have intended absurd (impossible) results. *United States v. X-Citement Video, Inc.,* --- U.S. ----, ----, 115 S.Ct. 464, 468, 130 L.Ed.2d 372 (1994); *Towers v. United States (In re Pacific-Atlantic Trading Co.),* 64 F.3d 1292, 1303 (9th Cir.1995). Courts will not foolishly bind themselves to the plain language of a statute where doing so would "compel an odd result." *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 509, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989). For, " "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the

surest guide to their meaning.' " *Public Citizen v. United States Department of Justice,* 491 U.S. 440, 454-55, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). *Cf. Green v. Bock Laundry Mach. Co.,* 490 U.S. at 527-30, 109 S.Ct. at 1994-95 (Scalia, J., concurring) ("We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result. Our task is to give some alternative meaning to the [language] ... that avoids this consequence....").

Our jurisprudence has eschewed the rigid application of a law where doing so produces impossible, absurd, or unjust results. "[I]f a literal construction of the words of a statute would lead to an absurd, unjust, or unintended result, the statute must be construed so as to avoid that result." *United States v. Mendoza,* 565 F.2d 1285, 1288 (5th Cir.1978) (citing *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892); *see also United States v. Castro,* 837 F.2d 441, 445 (11th Cir.1988). "[E]ven when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed [the purpose of the act], rather than the literal words." *Perry v. Commerce Loan Co.,* 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966) (internal quotation marks omitted).

As is often the case, the legislature will use words of general meaning in a statute,

> words broad enough to include an act in question, and yet a
> consideration of the whole legislation, or of the

circumstances surrounding its enactment, or of *the absurd results which follow from giving such broad meaning to the words,* makes it unreasonable to believe that the legislator intended to include the particular act.

*Public Citizen,* 491 U.S. at 454, 109 S.Ct. at 2566-67 (quoting *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)) (emphasis supplied). Thus, this court has found that

> [g]eneral terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.

*Zwak v. United States,* 848 F.2d 1179, 1183 (11th Cir.1988) (quoting *Sorrells v. United States,* 287 U.S. 435, 447, 53 S.Ct. 210, 214, 77 L.Ed. 413 (1932)). For instance, common sense says that a law making it a felony for a prisoner to escape from jail "does not extend to a prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt.' " *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 487, 19 L.Ed. 278, 280 (1869).

In this case, once JMS began the development, compliance with the zero discharge standard would have been impossible. Congress could not have intended a strict application of the zero discharge standard in section 1311(a) when compliance is factually impossible. The evidence was uncontroverted that whenever it rained in Gwinnett County some discharge was going to occur; nothing JMS could do would prevent all rain water discharge. George Fritcher, the county inspector charged with monitoring JMS's compliance with Gwinnett County's development permit, deposed that

it was simply impossible to stop sediment from leaving the subdivision when there was a rainfall event. "[Z]ero discharge of storm water *will never be achieved* because rainfall must find its way back into the streams and rivers of this state." Georgia EPD Amicus Brief, at 13 (emphasis supplied). Doug Ballard, president of JMS, similarly testified on cross-examination by Hughey's counsel that he could not stop the rain water that fell on his property from running downhill, and that nobody could. The rain that fell on his property "is designed to go down those curbs and designed to go down those pipes and unless you go out there and collect it in your hand some way or other it's going to have to go somewhere."

Moreover, JMS obtained from Gwinnett County a development permit that was issued pursuant to the County's authority under Georgia's Soil Erosion and Sedimentation Control Act of 1975 ("SESCA"), O.C.G.A. §§ 12-7-1 *et seq.* That Georgia statute, like the CWA, limited stormwater discharges during the applicable period. *See* O.C.G.A. § 12-7-6(18) (1992). Moreover, Georgia EPD's proposed standards for a general NPDES permit for stormwater discharges are similar to the standards for stormwater discharges contained in SESCA. David Word, the Chief of the Water Protection Branch of Georgia EPD, testified by affidavit that "the general NPDES permit proposed for stormwater runoff from construction activities ... will require permitees to perform certain erosion and sedimentation control practices, [which are] currently required under authority of the Erosion and Sedimentation Control Act of 1975." Accordingly, the fact that JMS was issued a development

permit by Gwinnett County suggests that JMS would have been able to obtain an NPDES permit from Georgia EPD, had such a permit been available.

The facts of this case necessarily limit our holding to situations in which the stormwater discharge is minimal, as it was here. The district court found that JMS's "discharges pose no threat to human health, and that much of the damage [caused by such discharges] will be reversed with the passage of a relatively short amount of time."

This was not a case of a manufacturing facility that could abate the discharge of pollutants by ceasing operations. Nor did the discharger come to court with unclean hands: JMS made every good-faith effort to comply with the Clean Water Act and all other relevant pollution control standards. The discharges were minimal, and posed no risk to human health. In sum, we hold that Congress did not intend (surely could not have intended) for the zero discharge standard to apply when: (1) compliance with such a standard is factually impossible; (2) no NPDES permit covering such discharge exists; (3) the discharger was in good-faith compliance with local pollution control requirements that substantially mirrored the proposed NPDES discharge standards; and (4) the discharges were minimal. *Lex non cogit ad impossibilia:* The law does not compel the doing of impossibilities. B LACK'S LAW DICTIONARY 912 (6th ed. 1990).

Practically speaking, rain water will run downhill, and not even a law passed by the Congress of the United States can stop that. Under these circumstances, denying summary judgment to JMS

was an error of law. *Cf. Menzel v. County Utilities Corp.,* 712 F.2d 91, 95 (4th Cir.1983) (refusing to impose CWA liability for discharges during period in which effectiveness of NPDES permit was stayed by state court, since subjecting discharger to liability would serve no statutory purpose).

*B. The Permanent Injunction—Federal Rule of Civil Procedure 65*

In addition to the fact that an injunction based upon an erroneous conclusion of law is invalid, *see United States v. Jefferson County,* 720 F.2d 1511, 1520 n. 21 (11th Cir.1983), Rule 65(d) of the Federal Rules of Civil Procedure mandates dissolution of the injunction.

Rule 65(d) sets forth the standards of specificity that every injunctive order must satisfy.

> Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained....

Rule 65 serves to protect those who are enjoined

> by informing them of what they are called upon to do or to refrain from doing in order to comply with the injunction or restraining order. As a result, one of the principal abuses of the pre-federal rules practice—the entry of injunctions that were so vague that defendant was at a loss to determine what he had been restrained from doing—is avoided. The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.

11A WRIGHT, MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2955 (1995) (footnotes omitted). In addition to giving those enjoined "fair and precisely drawn notice of what the injunction actually prohibits," *Epstein Family Partnership v. K-Mart Corp.,* 13 F.3d 762, 771 (3d Cir.1994), the specificity requirement of Rule

65(d) serves a second important function:

> Unless the trial court carefully frames it orders of injunctive relief, it is impossible for an appellate tribunal to know precisely what it is reviewing. We can hardly begin to assess the correctness of the judgment entered by District Court here without knowing its precise bounds. In the absence of specific injunctive relief, informed and intelligent appellate review is greatly complicated, if not made impossible.

*Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661, 664 (1974).

Consistent with the two foregoing purposes, appellate courts will not countenance injunctions that merely require someone to "obey the law." *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 897-98 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1974).[11] "Broad, non-specific language that merely enjoins a party to obey the law or comply with an agreement ... does not give the restrained party fair notice of what conduct will risk contempt." *Epstein Family Partnership, supra.* Because of the possibility of contempt, an injunction "must be tailored to remedy the specific harms shown rather than to enjoin all possible breaches of the law." *Id.* (internal quotation marks omitted). An injunction must therefore contain "an operative command capable of "enforcement.' " *Longshoremen's Ass'n. v. Marine Trade Ass'n.,* 389 U.S. 64, 73-74, 88 S.Ct. 201, 206-07, 19 L.Ed.2d 236, 244 (1967). *See also United States Steel Corp. v. United Mine Workers,* 598 F.2d 363, 368 (5th Cir.1979) (party subject to contempt proceeding may defend on basis that compliance was not possible).

_____

[11]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

Here, the district court's order granting permanent injunctive relief only stated:

> Defendant shall not discharge stormwater into the waters of the United States from its development property in Gwinnett County, Georgia, known as Rivercliff Place *if such discharge would be in violation of the Clean Water Act.*

(emphasis supplied).

Not only was this an "obey the law" injunction, it was also incapable of enforcement as an operative command. The court's order merely required JMS to stop discharges, but failed to specify how JMS was to do so. Discharges, though not defined by the order, occurred only when it rained, and *any* discharge was a violation of the order. Rain water ran into the subdivision's government-approved streets and storm sewers; then into the small stream that started on the subdivision property; on into a tributary stream; and eventually into the Yellow River. Was JMS supposed to stop the rain from falling? Was JMS to build a retention pond to slow and control discharges? Should JMS have constructed a treatment plant to comply with the requirements of the CWA?

The injunction's failure to specifically identify the acts that JMS was required to do or refrain from doing indicates that the district court—like the CWA, the EPA, Georgia EPD, and Mr. Hughey—was incapable of fashioning an operative command capable of enforcement. As such, we must vacate this "obey the law" injunction.[12]

_____

[12]Hughey contends that the injunction contains the requisite specificity by reference to the prior orders granting injunctive-type relief, *i.e.,* that the permanent injunction merely continued in place what previous orders had already done.

*C. Award of Attorney Fees and Costs*

A court issuing any final order in a Clean Water Act citizen's suit "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing party or substantially prevailing party, whenever the court determines such award is appropriate."   33 U.S.C. § 1365(d).   A prevailing or substantially prevailing party is one who prevailed "in what the lawsuit  originally sought to accomplish."    *Washington Public Interest Research Group v. Pendleton Woolen Mills,* 11 F.3d 883, 887 (9th Cir.1993).

The district court here awarded Hughey more than $115,000 in attorney fees and costs.   However, for the reasons stated above Hughey's citizen suit has not accomplished its original objective. Hughey is not a prevailing or substantially prevailing party and is thus not entitled to an award of attorney fees and costs. *See Save Our Community v. United States EPA,* 971 F.2d 1155, 1167 (5th Cir.1992) (where district court erred in finding defendant liable under the CWA, the award of attorney fees based thereon was also inappropriate).

## VI. CONCLUSION

Imposing liability upon JMS under these circumstances was a miscarriage of justice.   It is inconceivable that Congress intended, let alone foresaw, a result such as this under the Clean

---

*See, e.g., Keyes v. School Dist. No. 1., Denver, Colo.,* 895 F.2d 659 (10th Cir.1990), *cert. denied,* 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991).  We doubt that such an exception exists, unless in very rare, exceptional cases.  A person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing.  That was not the case here.

Water Act.  Environmentally safe waters are of vital importance to this nation as is evident from the fact that Congress enacted an entire statutory scheme to address the problem.  Nevertheless,

> [t]he inability of [Georgia EPD] to meet its statutory obligations has distorted the regulatory scheme and imposed additional burdens which must be equitably distributed.  This task is a difficult one because of the nature of the available options.  Either the affected discharger must be compelled to risk potential enforcement proceedings in spite of [the complete unavailability of an NPDES permit], or society must tolerate slippage of an interim pollution abatement deadline.

*Republic Steel Corp. v. Train,* 557 F.2d 91, 94 (6th Cir.1977).  Balancing these concerns on the basis of the record before us, we refuse to place the burden on JMS.

The orders imposing statutory penalties and attorney fees and costs were premised on the finding that JMS was liable under the CWA.  Because we REVERSE this finding of liability, those orders are VACATED.

The injunctive relief issued by the district court on February 24, 1994, was improper not only because it was premised on an error of law, but also for the alternative reasons that the injunction lacked the specificity required by Rule 65(d), and compliance with its terms was impossible.  Accordingly, the permanent injunction is DISSOLVED.[13]

---

[13] Because JMS has not raised the jury trial question, we will not address it now for the first time, although it would appear to require summary reversal on the issue of liability. *See Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (defendants under the CWA have Seventh Amendment right to a jury trial on questions of liability).

Because we have determined that JMS cannot be liable no matter who files the complaint, we do not discuss JMS's challenge to the propriety of the citizen's suit. *See, e.g., Gwaltney v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (citizen suits should

IT IS SO ORDERED.

CARNES, Circuit Judge, concurring:

I concur in all of the Court's holdings and opinion except for Part V.B.  What the Court says there about Rule 65(d) and "obey the law" injunctions may be correct, or it may be incorrect, but it is certainly dicta.  Given our holding that the plaintiff in this case is not entitled to any relief at all, it matters not whether the relief he was given would have been in proper form if he had been entitled to some relief.

---

be interstitial, not intrusive);  *Northwest Environmental Advocates v. Portland,* 11 F.3d 900, *vacated,* 56 F.3d 979 (9th Cir.1995) (initially deciding citizen suits were unauthorized when challenging water quality standards in an NPDES permit, latter opinion found citizen suits were not so limited);  *Proffitt v. Rohm & Haas,* 850 F.2d 1007, 1014 n. 11 (3rd Cir.1988) (refusing to decide whether scope of citizen suits was limited).

We also decline to address the issues of Hughey's standing, JMS's substantive due process challenge, and the fee award's lodestar calculation, as they are rendered unnecessary by the holding herein.