MISSISSIPPI RIVER REVIVAL, INC., and West Side River Watch, Inc., Plaintiffs,

v.

ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and City of St. Paul, Minnesota, Defendants.

Mississippi River Revival, Inc., West Side River Watch, Inc., and Mississippi Corridor Neighborhood Coalition, Inc., Plaintiffs,

v.

Administrator, United States Environmental Protection Agency, and City of Minneapolis, Minnesota, Defendants.

Nos. 99 Civ. 1597 DDA/FLN,
99 Civ. 1596 DDA/FLN.

United States District Court,
D. Minnesota.

Aug. 10, 2000.

Richard Brian Bates, St. Paul, MN, for Plaintiffs.

David S. Gualtieri, Environmental Defense Section, United States Department of Justice, Washington DC, Reginald Pallesen, Assistant Regional Counsel, United States Environmental Protection Agency, Chicago, IL, for Defendant Administrator, United States Environmental Protection Agency.

Matthew J. Pfohl, Assistant City Attorney of the City of St. Paul, St. Paul, MN, for Defendant City of St. Paul, Minnesota.

## ORDER

ALSOP, Senior District Judge.

These two actions are citizen suits brought pursuant to section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a). Plaintiffs claim that the Cities of St. Paul and Minneapolis are discharging storm water into the Mississippi River, in violation of the CWA's permit requirement for storm water runoff. *See* 33 U.S.C. §§ 1311(a), 1342(p). All parties acknowledge that both St. Paul and Minneapolis applied for permits in 1992 and 1993, but that half-way through the year 2000 final permits have yet to be issued. This litigation essentially attempts to hold someone accountable for the inexcusable delay.

Defendant Administrator of the United States Environmental Protection Agency ("EPA") has moved to dismiss both actions, maintaining that it does not have a mandatory duty to issue the permits; rather, it argues that the responsibility for their issuance rests with the State of Minnesota. Defendant City of St. Paul has moved to dismiss the action against it, asserting that it should not be punished for the failure of the permit issuing authority to act on its permit application. It also argues that this Court lacks jurisdiction to consider a citizen suit challenge to the adequacy of a permit application.

For the following reasons, the Court will grant the EPA's motion to dismiss and will grant in part and deny in part St. Paul's motion to dismiss.

## I.

In 1972 Congress passed significant amendments to the CWA (also known as the Federal Water Pollution Control Act), 33 U.S.C. §§ 1251–1387, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "Although the statute launches a multipronged attack on the problem of water pollution, it relies primarily on a permit program for the achievement of effluent limitations—restrictions on the quantity of pollutants that may be discharged into the nation's waters—to attain its goals." *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 695 (D.C.Cir.1974). In particular, under the CWA, it is unlawful for any person to discharge a "pollutant" from any "point source" without obtaining a National Pollutant Discharge Elimination System ("NPDES") permit and complying with its terms. *See* 33 U.S.C. §§ 1311(a), 1342.[1]

These lawsuits involve the discharge of storm water into the Mississippi River through the Cities' storm sewers. Thus, and this is not in dispute, the storm water discharge is subject to the NPDES permitting requirements. *See* 55 Fed.Reg. 47,990, 47,991 (1990) ("[M]ost urban runoff is discharged through conveyances such as separate storm sewers or other conveyances which are point sources under the CWA. These discharges are subject to the NPDES program.").

The appropriate means of regulating storm water discharges under the NPDES program has been the subject of controversy since the passage of the CWA amendments. In 1973 the EPA Administrator promulgated regulations that attempted to exempt uncontaminated storm water discharges from the NPDES permit requirements on the basis of administrative infeasibility. The Court of Appeals for the District of Columbia, however, set aside these regulations on the ground that "the EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402 [33 U.S.C. § 1342]." *Natural Re-*

---

**1.** The term "pollutant" includes a long list of substances, including industrial, municipal, and agricultural waste. 33 U.S.C. § 1362(6). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel ... from which pollutants are or may be discharged." *Id.* § 1362(14).

sources Defense Council, Inc. v. Costle, 568 F.2d 1369, 1377 (D.C.Cir.1977). Following this decision, the EPA issued proposed and final rules covering storm water discharges on several occasions, each being challenged at the administrative level and in the courts. Defenders of Wildlife v. Browner, 191 F.3d 1159, 1163 (9th Cir. 1999) (citation omitted).

In an attempt to resolve the controversy over the proper regulation of storm water discharges, Congress passed the Water Quality Act ("WQA") of 1987. See Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 966 F.2d 1292, 1296 (9th Cir.1992). Among other things, Congress added section 402(p) to the CWA, 33 U.S.C. § 1342(p). Section 402(p) established a framework for the EPA to implement the NPDES permit program requirements for municipal and industrial storm water discharges. As a general rule, most entities were not required to have a permit until October 1, 1992—a date Congress later changed to October 1, 1994. See Defenders of Wildlife, 191 F.3d at 1163 n. 1 (citing Pub.L. No. 102–580); see also 33 U.S.C. § 1342(p)(1). Congress created several exceptions to this rule, however, requiring certain categories of point sources to obtain a permit before this date. This included municipal separate storm sewer systems ("MS4s") serving a population of 100,000 or more but less than 250,000 ("medium" MS4s), and MS4s serving a population of 250,000 or more ("large" MS4s). 33 U.S.C. § 1342(p)(2)(C)–(D). Although there has been some confusion on this issue, Plaintiffs' most recent position, and the position of the EPA, is that Minneapolis and St. Paul are considered large MS4s.[2]

In section 402(p), Congress imposed a February 4, 1989 deadline on the EPA to establish regulations for permit application requirements for large MS4s. Id. § 1342(p)(4)(A). Congress further provided that applications for permits for storm water discharges from large MS4s had to be filed by February 4, 1990, and the issuing authority had to approve or deny the permits by February 4, 1991. Id.[3] Notwithstanding Congress' directive, the EPA did not issue final rules regarding permit applications for large MS4s until November 16, 1990, almost two years past the deadline. Natural Resources Defense Council, 966 F.2d at 1296 (citing 55 Fed. Reg. 47,990 (1990)). The EPA rules, moreover, extended the statutory deadline for when the applications were due, and also divided the application process into two parts. 40 C.F.R. § 122.26(d). Under the EPA's extension for large MS4s, Part I of the application was due November 18, 1991, and Part II was due November 16, 1992. 40 C.F.R. § 122.26(e)(3). The deadline to issue or· deny a timely permit application for a large MS4 was extended to November 16, 1993, and, for untimely applications, one year after receipt of a completed permit application. 40 C.F.R. § 122.26(e)(7)(ii).

According to Plaintiffs, St. Paul submitted Part I of its application for a NPDES permit in May 1992 and Part II on May 17, 1993, both Parts approximately six months late. Plaintiffs do not indicate when Minneapolis submitted Part I of its application, but they allege that Minneapolis timely submitted Part II on November 16, 1992. Plaintiffs further allege that neither City has been issued a final permit in violation of the deadlines, though the parties agree that draft permits have been

---

**2.** Plaintiffs in their Complaints alleged that Minneapolis and St. Paul are medium MS4s. (99–1596 ("Mpls") Complaint ¶ 12; 99–1597 ("St.P") Complaint ¶ 11.) In their response to the EPA's motion, however, Plaintiffs revised their claim to allege that Minneapolis and St. Paul are large MS4s. (Pls.' Mem. of Law in Opp'n to Def., EPA's, Mot. to Dismiss

at 6 n. 2, 8.) The EPA also lists Minneapolis and St. Paul as large MS4s. 40 C.F.R. ¶ 122.26(b)(4)(i) and app. F.

**3.** Congress provided more time for medium MS4s, but the same general scheduling framework applied. See id. ¶ 1342(p)(4)(B).

issued both prior to the filing of the Complaints and subsequent to them.

Plaintiffs brought these lawsuits to enforce compliance with the NPDES permitting requirements. Plaintiffs claim that their members have recreational, aesthetic and environmental interests in the Mississippi River, and that the Cities' continuous discharge of storm water into the Mississippi River without complying with the permitting requirements adversely affects their interests. More particularly, Plaintiffs claim that St. Paul has violated and continues to violate the CWA because: (1) it maintains storm water sewer systems which convey storm water to area surface waters without a permit; and (2) its application for a storm water permit does not fully comply with the application requirements. (St. P Complaint ¶¶ 16, 15.) The same claims are made against Minneapolis. (Mpls Complaint ¶¶ 17, 16.) Against the EPA, Plaintiffs allege that it has violated and continues to violate the CWA by failing its mandatory duties: (1) to approve or disapprove the Cities' storm water permit applications; (2) to require the Cities to resubmit their storm water permit applications; and (3) to issue storm water permits to the Cities. (St. P Complaint ¶ 17; Mpls Complaint ¶ 18.) Plaintiffs seek declaratory and injunctive relief, together with civil penalties, as well as an award of costs and attorney fees. Defendants EPA and St. Paul have moved to dismiss for separate reasons under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## II.

A motion to dismiss under Rule 12(b)(6) should be granted where " 'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.' " *Knapp v. Hanson,* 183 F.3d 786, 788 (8th Cir.1999) (citation omitted). In ruling on a Rule 12(b)(6) motion, the Court takes all facts alleged in the complaint as true and construes the allegations in the complaint and all reasonable inferences arising from the complaint in the light most favorable to the plaintiff. *Id.* The standard governing a motion under Rule

12(b)(1) depends on whether the moving party is making a "facial attack" or a "factual attack." *Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990). In the former, the court looks only to the face of the complaint and the plaintiff is entitled to the same protections as it would under Rule 12(b)(6). *Id.* In the latter, the court may consider matters outside the pleadings, and the plaintiff does not have the benefit of Rule 12(b)(6) safeguards. *Id.* at 730 n. 6. Ultimately, "[j]urisdictional issues, whether they involve questions of law or of fact, are for the court to decide." *Id.* at 729.

## III.

The EPA has moved to dismiss both actions on the ground that this Court lacks subject matter jurisdiction over Plaintiffs' claims under section 505(a)(2), the provision authorizing citizen suits against the EPA. Although the EPA has moved under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the Court views the motion as raising solely a question under Rule 12(b)(1)—specifically a "factual attack" on jurisdiction—and will treat it accordingly.

Section 505(a)(2) permits citizen suits only where the Administrator has failed to perform a *mandatory* act or duty:

> [A]ny citizen may commence a civil action on his own behalf ... against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is *not discretionary* with the Administrator.

33 U.S.C. § 1365(a)(2) (emphasis added); *see also Dubois v. Thomas,* 820 F.2d 943, 946 (8th Cir.1987) (to have jurisdiction, there must be a mandatory duty that the Administrator has failed to perform). The EPA contends that it does not have a mandatory duty to act on the Cities' permit applications. Rather, it argues that the authority for administering the NPDES permit program transferred to the State of Minnesota by agreement in

1974. Plaintiffs respond that the scope of the authority transferred from the EPA to the State did not include authority to issue NPDES storm sewer discharge permits. They therefore argue that the duty to issue the NPDES permits for discharges from MS4s remains exclusively with the EPA.

Plaintiffs' position is not convincing. Section 402(a) of the CWA establishes that the authority to issue a permit rests initially with the EPA. 33 U.S.C. § 1342(a)(1). However, in keeping "with its policy to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, Congress also provided that a State may issue NPDES permits for discharges into navigable waters within its jurisdiction ... upon EPA approval of the State's proposal to administer its own program." *Environmental Protection Agency v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 206–08, 96 S.Ct. 2022, 2025–26, 48 L.Ed.2d 578 (1976) (internal quotations and citations omitted); *see* 33 U.S.C. § 1342(b). Once the State's program has been submitted and approved, the EPA must *"suspend the issuance of permits ...* as to those discharges subject to such program." 33 U.S.C. § 1342(c) (emphasis added).

On June 30, 1974, the EPA authorized the State of Minnesota to issue NPDES permits "for *all* discharges in the State of Minnesota other than those from agencies and instrumentalities of the Federal Government." (Pls.' Ex. E (emphasis added).)[4] That approval is codified under Minnesota law and delegated to the Minnesota Pollution Control Agency ("MPCA"). *See* Minn.Stat. § 115.03, subd. 1(e) ("The [MPCA] is hereby given and charged with the following powers and duties ... [t]o adopt, issue, reissue, modify, deny, or revoke, enter into or enforce reasonable ... permits ... in order to prevent, control or abate water pollu-

tion...."); *see also id.* § 115.03, subd. 5 (MPCA "shall have the authority to perform any and all acts minimally necessary ... to the participation by the state of Minnesota in the National Pollutant Discharge Elimination System...."). In line with this authority, St. Paul and Minneapolis submitted their permit applications for storm water discharges to the MPCA, and the administrative process before the MPCA is on-going—albeit long past the deadlines set by Congress. Plaintiffs, in addition, are actively participating in the process, as they are entitled to do.

Plaintiffs admit that the State is authorized to issue NPDES permits. But they contend that the 1974 transfer of authority, which broadly authorized the State to issue NPDES permits "for *all* discharges" except from federal facilities, did not in fact encompass the authority to issue permits for storm water discharges. They make this argument even though the MPCA has already issued, with apparently no question of its authority to do so up until now, draft permits to each City. Plaintiffs reason that it was the WQA of 1987—not the CWA amendments of 1972—that created the duty to issue MS4 permits. They argue therefore that the State had to undergo a separate approval process before it could issue any permits for MS4s, which it has never done.

Plaintiffs' position is belied by their own submissions, if not by their own conduct. As the legislative history upon which they rely reveals:

> *Since 1972,* municipal separate storm sewers have been subject to the point source permits requirements of the Clean Water Act.

(Pls.' Mem. at 5 (citing 132 Cong.Rec. 32,-381 (1986)) (emphasis added).) Indeed, the fact that the EPA attempted to *exempt* storm water discharges from the permit requirements in 1973, as noted above, serves as an implicit acknowledgment that

---

**4.** The EPA's approval followed submissions of a number of documents by the State, including the Attorney General's Statement, the

Memorandum of Agreement between the EPA and the Minnesota Pollution Control Agency, and the Permit Program Description.

storm sewers were point sources covered by the 1972 amendments. *See Natural Resources Defense Council v. Costle,* 568 F.2d at 1372. The EPA stated this explicitly in 1990. *See* 55 Fed.Reg. at 47,991 ("[S]eparate storm sewers ... are point sources *under the CWA.* These discharges are subject to the NPDES program.") (emphasis added). As the EPA argues, the WQA and the rules promulgated thereunder merely established implementation requirements, including deadlines, for NPDES MS4 permits. It did not establish a new program for which the State was required to obtain separate approval.

Plaintiffs argue, alternatively, that even if the State was given the authority to issue NPDES permits for storm water discharge in 1974, the failure to issue those permits over time created a mandatory duty with the EPA to act under the so-called "constructive submission" theory of subject matter jurisdiction. This theory has been applied by some courts in the context of section 303(d) of the CWA, 33 U.S.C. § 1313(d), to trigger the EPA's underlying mandatory duty to approve or disapprove a state's submission of the total maximum daily load ("TMDL") of pollutants which may be released without violating water quality standards. *See generally Sierra Club v. Browner,* 843 F.Supp. 1304, 1312 (D.Minn.1993). Under this theory, a state's failure to submit any TMDL list over a prolonged period of time is considered a "constructive submission" of no TMDLs, which the EPA is then statutorily mandated to approve or disapprove. *Id.; see* 33 U.S.C. § 1313(d)(2) ("The Administrator *shall* either approve or disapprove such identification and load not later than thirty days after the date of submission.") (emphasis added). If the Administrator disapproves the list, moreover, "he *shall* ... identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards...." 33 U.S.C. § 1313(d)(2) (emphasis added).

This theory is inapplicable here, however, because section 303(d) "clearly places a mandatory duty on the EPA to develop TMDL lists if the state's lists are inadequate." *Sierra Club,* 843 F.Supp. at 1312. In contrast, there is no comparable mandatory duty under section 402. While section 402 requires the State to "transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application," 33 U.S.C. § 1342(d)(1), there is no corresponding mandatory duty for the EPA to approve or disapprove any permit application or action. *See District of Columbia v. Schramm,* 631 F.2d 854, 860 (D.C.Cir.1980) (EPA's decision on whether to veto a state NPDES permit application is discretionary and not reviewable in federal court). Indeed, the EPA is not even required to review a proposed permit application and can even waive its right to review, object to, or comment upon certain categories of State issued permits. *See* 33 U.S.C. § 1342(d)(3), (e); *see also* 40 C.F.R. § 123.24(d). The "constructive submission" theory therefore is inapplicable in this context.

In conclusion, section 402(p) places the responsibility for issuing or denying each MS4 permit on "the Administrator or the State, as the case may be." 33 U.S.C. § 1342(p)(4)(A). Since the State obtained authorization to administer the NPDES permit program in 1974, the duty to issue or deny the Cities' applications for MS4 permits rests with the State, not the EPA. Accordingly, the Court will grant the EPA's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

### IV.

St. Paul moves to dismiss the two claims asserted against it. It contends that Plaintiffs' first claim that it has violated and continues to violate the CWA for maintaining storm water sewer systems which convey storm water to area surface waters without a permit should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Relying on a narrow excep-

tion created in *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523 (11th Cir.1996), St. Paul argues that it should not be liable for violating the CWA permit requirements based on the failure of the State to act on its permit application. As for Plaintiffs' second claim that St. Paul is liable under the CWA because its application for a storm water permit does not fully comply with the application requirements, St. Paul argues that this claim should be dismissed under Federal Rule of Civil Procedure 12(b)(1). St. Paul contends that the CWA provides no jurisdiction for a citizen suit which challenges the adequacy of a permit application.

St. Paul's argument that Plaintiffs' first claim fails to state a claim upon which relief can be granted is without merit. Section 301(a) of the CWA *absolutely prohibits* the discharge of any pollutant by any person, unless the discharge is made according to the terms of a NPDES permit. 33 U.S.C. § 1311(a) ("Except as in compliance with this section and sections ... 1342 ... of this title, the discharge of any pollutant by any person is unlawful."). Plaintiffs allege—and St. Paul admits—that it does not have a NPDES MS4 permit, and yet it continues to discharge storm water through its storm sewers into the Mississippi River. The Complaint therefore states a claim for purposes of Rule 12(b)(6).

The Court, however, agrees with the rationale of the Eleventh Circuit in its *Hughey* opinion.[5] As the Eleventh Circuit has explained, *Hughey* recognized a "narrow exception" to the zero discharge standard "for any minimal discharge that occurs despite [an entity's] best efforts to reduce the amount of it and comply with the applicable law." *Driscoll v. Adams*, 181 F.3d 1285, 1289 (11th Cir.1999). *Hughey* set out four factors which were essential to the exception: (1) compliance with the zero discharge standard is factually impossible; (2) no NPDES permit covering such discharge exists; (3) the discharger was in good faith compliance with local pollution control requirements that substantially mirrored the proposed NPDES discharge standards; and (4) the discharges were minimal. *Hughey*, 78 F.3d at 1530. This exception is based on the well-recognized rule that the "law does not compel the doing of impossibilities." *Id.* Indeed, "[p]ractically speaking, rain water will run downhill, and not even a law passed by the Congress of the United States can stop that." *Id.*

Whether the *Hughey* factors are met in this case cannot be determined at this stage of the litigation. Even if the Court converts St. Paul's motion to a summary judgment motion, the sparse record is insufficient to remove any dispute of materi-

---

**5.** In an unusual step, the EPA has submitted a memorandum opposing St. Paul's motion, arguing that this Court should not follow the *Hughey* exception to the zero discharge standard. The EPA appears content to have this Court hold others at fault for the failure to obtain or issue a MS4 permit in a timely fashion, while completely removing itself from any responsibility. The Court finds the EPA's position to be disingenuous, especially in light of the EPA's own well-documented—and unlawful—failure to abide by the deadlines set by Congress. *See Natural Resources Defense Council v. United States Environmental Protection Agency*, 966 F.2d at 1300 (holding that EPA's failure to abide by the statutory deadlines in section 402(p) was "unlawful"). The EPA does not have a mandatory duty to act on these permit applications, but it does have a discretionary ability to enforce compliance. Section 402(c)(3) grants the EPA the authority to withdraw approval of a NPDES State's permitting authority "[w]henever the Administrator determines after public hearing that a State is not administering [its NPDES] program ... in accordance with the requirements of this section." 33 U.S.C. § 1342(c)(3). Although more facts may come to bear on this issue, perhaps it is time to consider this drastic remedy. *See* 40 C.F.R. § 123.63(a)(2)(i) (setting forth criteria for withdrawal of State programs, "including failure to issue permits"). Indeed, the Court has not been presented with any justifiable reason for the MPCA's failure to issue or deny the Cities' permit applications over *six years* past its deadline to do so. In the meantime, while the EPA shuns responsibility and the MPCA proceeds at an inexcusable pace, the Cities continue to discharge storm water into the Mississippi River without a NPDES permit.

al fact. St. Paul has attached only three exhibits—two draft permits and Plaintiffs' settlement demand letter—and these do not prove as a matter of law that the four elements are satisfied. Accordingly, the Court will deny St. Paul's motion to dismiss the first claim asserted against it.

 St. Paul's motion to dismiss the second claim has gone unopposed. St. Paul argues that section 505(a)(1) authorizes citizen suits against dischargers who fall to comply with either the substantive effluent limitations contained in the Act, or with the terms of an NPDES final permit. It does not authorize · jurisdiction for an action challenging the contents of a permit application:

> [A]ny citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

33 U.S.C. § 1365(a)(1). The Court agrees that the CWA does not authorize the type of citizen suit alleged in the second claim against the City of St. Paul and will grant the City's motion to dismiss it.

\* \* \* \* \* \*

Upon its review of the files, motions and proceedings herein, it is hereby ORDERED that:

1. Defendant Administrator of the United States Environmental Protection Agency's Motions to Dismiss Plaintiffs' Complaints in Civil Actions 99–1596 and 99–1597 are GRANTED, and the claims asserted against it are DISMISSED for lack of subject matter jurisdiction;

2. Defendant City of St. Paul's Motion to Dismiss Plaintiffs' Complaint in Civil Action 99–1597 is GRANTED in part and DENIED in part as follows:

 a. Motion to Dismiss Count I is denied;

 b. Motion to Dismiss Count II is granted and Count II is DIS-

MISSED for lack of subject matter jurisdiction.